[Civ. No. 11672. First Dist., Div. Two.—June 18, 1941.]

JOHN GUTHRIE HEYWOOD, Plaintiff and Appellant, v. CHARLES H. SOOY, Defendant and Appellant.

G. G. Sanders for Plaintiff and Appellant.

J. H. Sapiro, Gregory A. Harrison and A. A. Heer for Defendant and Appellant.

SPENCE, J.—In this action for an accounting, a final judgment was entered in favor of plaintiff on June 11, 1937. A motion for a new trial was made by defendant which motion was denied on July 26, 1937, but the order denying the motion for new trial was accompanied by an order for the modification of the findings of fact, conclusions of law and judgment of June 11, 1937. Thereafter, and on August 4, 1937, the trial court signed an instrument entitled "Order and Judgment and Decree." It was ordered therein that the judgment of June 11, 1937, and so much of the order of July 26, 1937, as attempted to modify said judgment of June 11, 1937, be vacated and set aside and that the clerk enter *nunc pro tunc* as of July 26, 1937, "the following as the final and only judgment and decree in this action . . . " This judgment was entered on August 5, 1937. The nature of the various judgments and orders will be hereinafter discussed.

The defendant took an appeal from the judgment of June 11, 1937, from the order of July 26, 1937, and from the judgment of August 5, 1937. Plaintiff took an appeal from certain portions of the order of July 26, 1937, and thereafter took an appeal from certain portions of the judgment of August 5, 1937. The appeal of defendant is presented on one transcript and the appeals of plaintiff are presented on another transcript but all of said appeals have been consolidated.

There is no dispute concerning the material facts out of which this controversy arose. Plaintiff and defendant were attorneys at law and they engaged in the general practice of law as partners for several years. On December 31, 1927, the partnership was dissolved by mutual consent, the office files were allotted to the respective partners by agreement and there appears to have been an understanding with respect to which of the two partners would thereafter receive each of the retainers previously received by the firm and would perform the required services therefor. The partners further agreed, as found by the court, to "divide and allot as between themselves the said firm's unfinished business, and each of them thereupon mutually agreed at his own separate expense to liquidate and conclude said business allotted to him diligently and within a reasonable time, and to collect money due and to become due thereon, and to account to the other concerning all said matters within a reasonable time." The parties apparently concede that said finding was in accord with their agreement as no attack is made thereon. The parties do, however, attack the application made by the trial court of this provision of their agreement to the various matters which are the subject of this controversy.

Before proceeding to a discussion of these matters and to the contentions of the parties with respect thereto, it appears appropriate to discuss generally the nature of the rights and duties of the parties under the above-quoted provision of their agreement. It seems clear from the provision quoted that the term "unfinished business" was used by the parties to designate such pending and uncompleted business as had been undertaken by the partnership under contracts of employment with their clients. Each partner agreed, with respect to the "unfinished business" allotted to him, to "conclude said business" within a reasonable time and to collect and account for the fees received. This language presupposes the existence of a duty on the part of the partnership to perform the services necessarily involved in the completion of such "unfinished business". As we view the situation, the duties imposed upon each partner by said provision of the agreement were similar to the duties which are imposed by law upon a surviving partner when a partnership is dissolved by the death of the other partner. The rights and duties of such surviving partner were discussed at some

length in *Little* v. *Caldwell,* 101 Cal. 553 [36 Pac. 107, 40 Am. St. Rep. 89]. It was there said at page 561, "While it is certainly true when a professional partnership between attorneys at law is dissolved by the death of one, the survivor is entitled to his own future earnings, and is not required to make an allowance in the settlement of the partnership accounts for what may be termed the good will of the partnership, or for the profits of such future business as may have been given to him by former clients of the firm, still, in regard to unfinished business intrusted to the firm, and which the client permits the surviving partner to complete, such contract of employment, although not capable of assignment, is still to be viewed by a court of equity as an asset of the partnership."

We are of the opinion that the test of what constitutes "unfinished business" of a partnership upon dissolution within the meaning of the rules set forth in *Little* v. *Caldwell, supra,* and within the meaning of the agreement of the parties here is whether there existed, at the time of the dissolution, any contract of employment between the partnership and the clients for the performance by the partnership of the services thereafter claimed to be "unfinished business". It will be noted that the cited case refers to the "contract of employment" and states that such contract is to be viewed by a court of equity as an asset of the partnership. It will be further noted that the cited case repudiates the notion that a partner is accountable after dissolution for any allowance for what may be termed the "good will" of the partnership which may result in contracts of employment after dissolution. While the cited case did not involve the precise points presented here, we believe that it clearly indicates the line of demarcation between "unfinished business", being business covered by contracts of employment at the time of dissolution, and other matters, not covered by contracts of employment, but which thereafter become the subjects of contracts of employment through the good will previously existing between the partnership and the clients. As to the "unfinished business", a duty to perform services rests on the partnership at the time of dissolution and continues thereafter to rest on the partners or the surviving partner. As to the other matters, no duty to perform services rests on the partnership at the time of dissolution and no duty continues thereafter to rest on the partners or surviving

partner. And where no duty to perform the services rests on the partnership at the time of dissolution, such services as may thereafter be performed by either of the former partners under contracts of employment subsequently made with former clients cannot be considered "unfinished business" of the partnership at the time of the dissolution. In the light of the views which we have expressed, we may now proceed to a consideration of the three matters which are the main subjects of controversy on these appeals.

### Roman Checa Matter.

 This matter had its origin in the representation by the partnership of the Pacific National Bank, which bank paid to the partnership an annual retainer fee covering advice on all matters not involving litigation. At the time of the dissolution, the retainer fees covering the period of the existence of the partnership were divided and Mr. Sooy thereafter continued as general counsel for the Pacific National Bank upon an annual retainer. Mr. Heywood concedes that he had no interest in this retainer after the dissolution.

Long prior to the dissolution of the partnership, Roman Checa became indebted to the bank upon a guaranty of the indebtedness of the Eagle Steamship Company, which indebtedness had not been paid. Roman Checa had made certain assignments to the bank of his stock and of his participating interest in the Creole Syndicate as security. The bank, without consulting the partnership, had employed New York counsel to institute an action on behalf of Roman Checa against the Creole Syndicate. That litigation had been pending for some time before the advice of the partnership was sought on any phase of this matter. Before said New York action had been brought to a successful conclusion, Roman Checa was adjudicated an involuntary bankrupt in the United States District Court in New York. After the dissolution of the partnership and early in 1928, the Creole Syndicate paid to Roman Checa's trustee in bankruptcy the sum of $175,000 in settlement of the action brought by Roman Checa in New York. Thereafter the general creditors of Roman Checa challenged the priority of the bank's claim and other persons claimed to have priority over the bank by reason of prior assignments from Roman Checa. The bank

became alarmed and sent one of its officers to New York to look out for its interests. Before said officer left San Francisco, and on March 12, 1928, Mr. Sooy was asked to recommend counsel in New York to represent the bank in its controversy with the trustee and the other creditors of Roman Checa. Mr. Sooy did recommend other counsel in New York and on March 12, 1928, gave said officer of the bank a letter of introduction to such counsel. Said New York counsel accepted employment by the bank, concluded the matter by a substantial recovery for the bank in 1930, received a fee from the bank of $10,000 and thereafter sent Mr. Sooy a check for $2,500 as a "forwarding fee".

Mr. Heywood contends that he has the right to share in said fee of $2,500 received by Mr. Sooy claiming that it represents the payment for services included in the unfinished business of the partnership at the time of the dissolution. We find no merit in this contention. It appears unnecessary to discuss the delicate question of the nature of a so-called "forwarding fee" or the question of whether it represents payment for services performed by the recipient thereof. It is a sufficient answer to Mr. Heywood's contention to point out that the partnership had no contract of employment at the time of the dissolution for the performance of any of the services for which the fee of $10,000 was paid to New York counsel and out of which the "forwarding fee" was paid to Mr. Sooy. If Mr. Sooy himself, rather than New York counsel, had entered into a contract of employment with the bank after dissolution for the performance of said services in the New York litigation, such contract could not have been treated as a partnership asset under the rules to which reference has been made. It necessarily follows that any fee received as a "forwarding fee" from other counsel, employed by the bank to perform such services, cannot be so treated.

### Cohen Furniture Company Matter.

This matter likewise appears to have had its origin in the representation by the partnership of the Pacific National Bank but the partnership had performed certain services and collected certain fees for these services in a trusteeship prior to the dissolution.

Mr. A. Cohen, doing business as A. Cohen Furniture Company, was indebted to the bank. He became involved in financial difficulties and was adjudicated a bankrupt in 1926.

He made a composition with his creditors and, in connection therewith, a trust was created and Mr. Pitner, one of the officers of the bank, was named as trustee. Mr. Pitner employed the partnership as his attorneys as such trustee. This employment continued until the time of dissolution and the trustee had paid the partnership approximately $5,000 in fees up to that time. At that time, all that remained in the trustee's hands was a sum of money to be distributed and the affairs of the trust had been concluded except for the rendition of the trustee's final account. After the dissolution, a dispute arose with Mr. Pitner regarding the amount to be paid as the balance of the partnership's fees and the matter was referred to Mr. Mason, chairman of the board of the Pacific National Bank. He fixed the amount of the balance to be paid at $1,000 and this amount was paid by Mr. Pitner by a check made out to Sooy and Heywood on May 29, 1928. On that day Mr. Pitner addressed a letter to Sooy and Heywood stating that the check was being sent "agreeable to the settlement as to the balance of these fees". It was further stated therein that the check covered "the balance of your fees for services rendered in this matter, and include the following services still to be rendered. First, perusal of the trustee's final report as to its final form. Second, computation from the report of the trustee's fee." There is no controversy over the fees above mentioned.

In July, 1928, some of the creditors of the Cohen Furniture Co. brought an action against the bank and Mr. Pitner charging misrepresentation and fraud in bringing about the formation of the trust and a wrongful preference of the bank by Mr. Pitner in the proceedings. Said creditors sought the cancellation of the agreement, an accounting and a winding up of the affairs of the trust. The defense of this action was placed in the hands of Mr. Sooy, who appeared as counsel for the bank and who caused certain associates to appear as counsel for Mr. Pitner. For the services performed in the defense of this action, Mr. Sooy received a fee of $3,750.

Mr. Heywood contends that he has the right to share in said fee of $3,750 claiming that it represents the payment for services included in the unfinished business of the partnership at the time of the dissolution. We find no merit in this contention. At the time of the dissolution, the litigation

in which said services were rendered was not in contempla-
tion of the parties. It is true that on December 31, 1927,
the parties were under at least an implied contract to perform
certain further services for the trustee. The exact nature of
said further services was made clear by the acceptance of the
$1,000 check on May 29, 1928, under the conditions set forth
in the letter accompanying the same. The services performed
in the defense of the new action filed in July, 1928, were not
services for the performance of which the partnership was
under a contract of employment at the time of the dissolu-
tion. The client was free to choose any counsel it saw fit
for the defense of said action. Either of the former members
of the partnership was free to accept or reject employment
as counsel in the defense of said action. The contract of em-
ployment for the defense of said action was necessarily made
after knowledge had been gained that the action had been
filed in July, 1928, and the services performed pursuant to
that contract was "new business" of one of the former mem-
bers of the partnership rather than "unfinished business" of
the partnership.

### *Shimizu* v. *Williams Matter.*

■ In April, 1926, the partnership was substituted for
other counsel as attorneys for M. Shimizu, as guardian of the
persons and estates of his minor daughters, Michie Shimizu
and Masako Shimizu. An annual retainer was agreed upon
to cover the preparation and settlement of the annual account
of the guardian and for general advice concerning matters
pertaining to the guardianship. The retainer fees up to the
time of dissolution were divided and there is no dispute con-
cerning Mr. Sooy's right to the retainer fees becoming due
after the dissolution. The controversy in this matter arises
over a fee of $5,000 received by Mr. Sooy in 1928 in a certain
action brought by the guardian.

The estate of the minors consisted of certain real property
in Signal Hill and a large sum of money accumulated from
royalties derived from an oil lease with the Dabney Oil Syndi-
cate covering said property. At the time of the substitution
of the partnership as attorneys for the guardian in the guard-
ianship proceedings, there was delivered to the partnership
among other things a copy of certain pleadings in an action to
quiet title brought by the guardian against one Williams and
his wife who were the former owners of the property.

Neither the Los Angeles attorneys who previously represented the guardian in the guardianship proceedings nor the partnership were ever attorneys for the guardian in said quiet title action prior to the dissolution of the partnership. Said action had been brought on behalf of the guardian by other Los Angeles attorneys, which last mentioned attorneys remained attorneys of record in said action until February 2, 1928, being more than one month after said dissolution.

In said quiet title action, the guardian alleged that in 1920, defendants Williams had sold the land in question to one Nakamura, who was then acting as guardian for said minors. It was also alleged that a deed had been delivered by defendants to Nakamura as guardian but that said deed had been lost or destroyed without being recorded. The minors sought in said action, brought by their subsequently appointed guardian, to quiet their title against the defendants. Defendants denied the execution of the deed and denied that said minors had any interest in the property and further alleged that the claimed contract of purchase and deed were in violation of the Alien Land Act. It does not appear that any further steps were taken by anyone in this litigation prior to the dissolution of the copartnership.

In the latter part of 1927, Shimizu wrote the partnership advising them that he had found the missing deed and was desirous of recording it. The Dabney interests were planning to do further drilling on the land and their counsel, desiring to clear the title before further money was expended, entered into negotiations directly with Williams in an attempt to get Williams to consent to judgment in favor of the minors upon payment by the Dabney interest to Williams of $3,000. Said counsel for the Dabney interests assured the partnership that said counsel's assistance in clearing the title would be without charge to the guardian or the minors. Some correspondence passed between the partnership and counsel for the Dabney interests in December, 1927, and a form for the substitution of the partnership as attorneys of record in the quiet title action was mailed to the partnership during that month by said counsel. Said form of substitution was signed by the partnership and returned to said counsel and Shimizu was requested by letter to call at the office of said counsel and sign the same. This he failed to do and it seems clear from

the evidence that Shimizu took the position that his discovery of the deed obviated the necessity for any further litigation. He therefore did not employ the partnership to represent him in said quiet title action at any time prior to the dissolution on December 31, 1927, and did not sign the proposed substitution. Several letters were exchanged as a result of which Mr. Sooy went to Los Angeles on January 14, 1928, and at that time Shimizu finally employed Mr. Sooy to start a second action to quiet title against Williams and his wife and also against Nakamura, agreeing to pay Mr. Sooy a retainer fee in said litigation of $2,500 and further agreeing that any additional fee for said litigation should be fixed by the court in the guardianship proceeding. The substitution of attorneys in the first quiet title action was signed by Shimizu at that time and was subsequently signed by the original attorneys in that case. Said first quiet title action was thereafter dismissed by Mr. Sooy, the second quiet title action was filed and prosecuted to judgment and Mr. Sooy collected a total fee of $5,000 in that litigation.

Mr. Heywood makes the contention that he is entitled to share in said fee of $5,000 claiming that it represents the payment for services included in unfinished business of the partnership at the time of dissolution. Here again we find no merit in the contention. It seems entirely clear that prior to the dissolution, the partnership had not been employed by Shimizu for any purpose except to render services and to give advice in the guardianship proceedings under the retainer fee. Other counsel had been employed by Shimizu for the purpose of the quiet title action and it appears that Shimizu had done nothing to indicate any intention of employing the partnership for that purpose at any time prior to the dissolution. As late as January 6, 1928, Shimizu wrote Mr. Sooy stating: ''I always thought this matter was settled while Mr. Geisler and Mr. Woolwine were taking care of this transaction . . . '', and it was not until January 14, 1928, that any contract was made for the employment of Mr. Sooy in the quiet title action. It therefore appears that there was no contract of employment for the performance of the services in the quiet title action by the partnership at the time of the dissolution and that said litigation cannot be treated as unfinished business of the partnership.

## The Judgments and Orders.

The various judgments and orders may be briefly summarized. The controversy in the trial court involved several matters including the three matters which remain the subject of the controversy on this appeal.

In the judgment of June 11, 1937, the trial court decided in favor of plaintiff on all of the matters now remaining in controversy, holding that the Roman Checa matter, the Cohen Furniture Company matter and *Shimizu* v. *Williams* matter constituted unfinished business at the time of the dissolution. A money judgment in the sum of $7,185.29 was entered in favor of plaintiff and against defendant. The trial court further awarded to plaintiff a sum of money on deposit in one bank in the name of defendant and a sum of money on deposit in another bank in the name of Sooy and Heywood but provided that upon receipt of said sums by plaintiff certain credits should be given to defendant upon the above-mentioned money judgment.

In the order of July 26, 1937, the trial court ordered an amendment of the findings of fact, conclusions of law and judgment, holding that the Roman Checa matter was not unfinished business and that Mr. Sooy was entitled personally to the fee therein and need not account therefor. The amount of the money judgment in favor of plaintiff was reduced accordingly to $5,968.63.

In the "Order and Judgment and Decree" of August 5, 1937, the trial court recited that judgment had been entered on June 11, 1937, and that the order had been entered on July 26, 1937; that the true judgment intended by the court was made obscure and uncertain by cross-references therein; that there were incorporated therein "determinations that may be in excess of and without the jurisdiction of this court in this action"; and that certain language was inadvertently and improperly included in said order of July 26, 1937; and that copies of said judgment and order had been served on certain banks and caused it to appear that a lien had been created on certain bank accounts thereby preventing the withdrawal of moneys from said accounts by defendant contrary to the intention of the court. It was therefore ordered, "in order that the final judgment in this case may be made to express the true intent of the court", that the judgment

of June 11, 1937, and so much of the order of July 26, 1937, as attempted to modify said judgment of June 11, 1937, be set aside and that the clerk enter *nunc pro tunc* as of July 26, 1937, ''the following as the final and only judgment and decree in this action. . . . '' The trial court then entered a new judgment in favor of plaintiff for the sum of $5,968.63 and eliminated all provisions awarding the sums of money in bank to plaintiff.

Appeals were taken by plaintiff and defendant as above indicated, plaintiff claiming that the trial court erred in holding that the Roman Checa matter was not unfinished business of the partnership at the time of the dissolution and defendant claiming that the trial court erred in holding that the Cohen Furniture Company matter and the *Shimizu* v. *Williams* matter were unfinished business of the partnership at the time of the dissolution. We have heretofore expressed the view that, upon the undisputed facts, none of said matters constituted unfinished business of the partnership at the time of the dissolution. It therefore becomes necessary to order a reversal and it appears appropriate to reverse with directions all of said judgments and orders.

The judgment of June 11, 1937, the order of July 26, 1937, and the ''Order and Judgment and Decree'' of August 5, 1937, are reversed with directions to the trial court to reframe its findings of fact and conclusions of law in accordance with the views expressed herein and to enter its judgment accordingly. The parties will bear their own costs on these appeals.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing was denied July 18, 1941, and plaintiff and appellant's petition for a hearing by the Supreme Court was denied August 14, 1941. Carter, J., voted for a hearing.