[L. A. No. 24510. In Bank. May 16, 1958.]

BERTILLE B. SMITH, as Administratrix With Will Annexed, etc., Respondent, v. FRANK BULL, Appellant.

A. G. Ritter and H. E. Lindersmith for Appellant.

Darling, Shattuck & Edmonds, Douglas L. Edmonds and Thomas F. Call for Respondent.

CARTER, J.—Defendant Frank Bull appeals from a judgment in favor of the plaintiff, Bertille B. Smith, administratrix with will annexed of the estate of her husband, Vincent Richard Smith, deceased. Mel Roach was also a defendant but judgment was in his favor.

The complaint originally pleaded 10 causes of action but on plaintiff's motion in open court, all causes of action, save the first were dismissed. The complaint alleged the existence of a partnership between Frank Bull and decedent, Vincent Richard Smith, and, in brief, an appropriation and conversion of the partnership assets, including goodwill, by defendant

Bull. The court's findings, conclusions of law and judgment were based upon the first cause of action. The judgment adjudicated that plaintiff was entitled to one-half of the proceeds of four accounts, to a certain sum of money on deposit with the Citizens National Trust and Savings Bank of Los Angeles, and "that plaintiff shall recover from defendant Frank Bull the sum of Twenty-eight Thousand Six Hundred Ninety-five and 83/100 Dollars with interest thereon from the date of entry of this final judgment until paid at the rate of 7% per annum" which sum represented one-half of the estimated value of the goodwill of the advertising agency known as Smith and Bull. It is from the quoted portion of the judgment that defendant Bull appeals.

The record shows that Vincent Richard Smith and Frank Bull had been associated together in the advertising business for many years. Their association began in 1936 and continued thereafter in different forms. At one time the association included others and operated as a corporation. On September 1, 1949, an oral partnership agreement was entered into between them for the purpose of conducting an advertising agency. While the agency, known as Smith and Bull, represented several accounts, the only major account was that of Seaboard Finance Company and the agency was, in effect, a "one-account" agency. The Smith and Bull agency employed some 21 or 22 employees and ran its own print shop in conjunction with the advertising business. Mel Roach, a defendant, was an employee of the agency and acted as general manager and senior account executive. His duties with the partnership centered around the Seaboard Finance account and he spent part of each day, while he was in town, at the Seaboard offices where he became very well acquainted with the executives of that company. Roach had been associated with Smith and Bull for almost the entire length of their association although his employment had not been continuous prior to the formation of the last partnership because of service with the armed forces and because he had been in business for himself at one time.

Smith was ill during the latter part of 1952 and was not as active in the partnership as he had previously been and was away from the office part of the time. The record shows that during this time Bull and Roach gradually took over the handling of the Seaboard account which Smith had previously brought into the office and had controlled. While Roach was the one who met with the Seaboard officials, the

298

guiding force and the one to whom he reported and from whom he took orders was Smith. During the latter part of the year 1952, however, the relationship apparently changed and Roach conferred with Bull with respect to the account. Although it appears that in December, 1952, Seaboard officials had expressed dissatisfaction with the handling of its account, that matter was not brought to Smith's attention. On January 15, 1953, a letter was written by Mr. Lide, the assistant vice president of Seaboard, referring to a "conversation between Frank Bull, Mel Roach and myself the early part of December" in which the topic of conversation had been that Seaboard was not "too happy" with the service rendered to it by Smith and Bull and calling to the partners' attention the fact that notice had been served "early in December that, unless things improved, it might be necessary to make a change in agencies March 1st. However, inasmuch as I will be out of the city for approximately three weeks, I think it only fair to extend the time to April 1st." The letter concluded with the hope that a change in agencies would not be necessary and that the association between Seaboard and Smith and Bull would continue for many years. This letter was not called to Smith's attention and, apparently only Bull, Roach and Seaboard knew of it. On February 5, 1953, Bull wrote a letter in longhand to Smith informing him that he was dissatisfied with Smith's handling of his personal affairs as well as his business plans for the future and that he believed the partnership should be "liquidated." This was the first time that Smith had learned that Bull was dissatisfied with the partnership relationship and was considering dissolution thereof.

The record contains an undated letter from Roach to Smith who had learned of the Seaboard letter of January 15th through a conversation with Mr. Lide. Although the record is not clear, this letter was probably written on, or about, February 20, 1953. The letter, which was signed "Mel," is as follows: "Overheard your [Smith's] request for a copy of the letter from Lide regarding Seaboard's ultimatum.

"She [secretary] has not seen, and knows nothing of the letter and Frank [Bull] and I grabbed the letter upon arrival to prevent anyone here seeing it. In wrong hands or with wrong interpretation, the letter could prove very embarrassing and create a new problem in the trade.

"You are very welcome to read it at any time but we don't want it moving out of the office or to have copies made. The situation is very quiet and I have just about resolved all

weakness and got the complaints quieted. Frank [Bull] called upon Thompson and Appleby [executives of Seaboard] and discussed the entire situation and everything is alright. Any further discussion or re-opening of the issues can only serve to confuse and irritate all concerned there.

"Lide is in the east on business and vacation and I don't want anything to arise in his absence which will cause him to get on me again about doing things while he is away. I've put Perkel [an employee] on the account with me and we have the whole year's campaign for all medias layed out and approved and Lide and the rest like his personality and his ideas and new approach to old ideas.

"All's well so don't worry about it any more."

Roach testified that at some time early in January, 1953, he notified Seaboard of the impending dissolution of the partnership, and that early in February, 1953, Seaboard informed him that its account would be transferred to "Frank Bull & Company." Bull admitted that, early in February, he notified Seaboard that the partnership of Smith and Bull was going to be dissolved. On February 20th, Bull signed a lease on new premises located not far from the offices occupied by the partnership; on the same day he certified that he was conducting an advertising agency at the new premises under the name of "Frank Bull & Company." Bull testified that on February 20th he was notified by Seaboard that its account would be transferred to him. On February 23d, Bull notified Smith of the lease he had taken. On February 26th, Seaboard notified Smith that it would no longer require his "personal services" and that because of the dissolution of the partnership of Smith and Bull, it would no longer place its account there. On February 27th, Smith and Bull signed and filed notices of dissolution of the partnership. At about this time Smith's attorney notified Bull's representative that Smith would hold Bull accountable for the goodwill of the partnership. On February 28th, Bull moved from the partnership offices to the new location taking with him the firm accounts, books, and all of the partnership employees except one. On March 1st, he commenced conducting an advertising agency known as Frank Bull and Company.

The record shows that Roach had told an employee of the partnership that he had the Seaboard account "in the palm of his hand; he could take it anywhere he wanted to. . . ." Bull admitted that he "probably did" or "might have" or "could have" told various people that Smith was

"constantly off his rocker," that he was taking so much medicine that his mind was affected, that he was "erratic and eccentric." The record also shows that Bull's decision to open his own agency was dependent upon the Seaboard account.

A certified public accountant, called and qualified as an expert witness for the plaintiff, testified that there was a goodwill factor attached to a personal service partnership such as the one under consideration; that it was not customary to carry such an item on the books of an organization, firm, or partnership, unless the goodwill had been purchased originally; that by using various known and approved methods of computation, he was of the opinion that the goodwill factor of the partnership should be valued at $57,391.66. This testimony was uncontradicted and defendants produced no expert witness to testify concerning the value of the goodwill. The record shows that after the dissolution Smith had no accounts and no business; that he was in the process of trying to organize a new agency at the time of his sudden death on June 6, 1953.

The trial court found, in accord with the allegations of plaintiff's complaint, that "during its existence, the co-partnership assets consisted of accounts receivable, bank accounts, personal and real property and goodwill. In February, 1953, defendant Frank Bull converted and appropriated for himself alone, and for his sole benefit and profit, the co-partnership business, goodwill, the customers and all the company employees, with one exception. At the time of said conversion and appropriation the partnership had a goodwill of fifty seven thousand three hundred ninety-one and 66/100 dollars ($57,391.66)." And the court concluded that the plaintiff was entitled to "a judgment against defendant Frank Bull in the sum of twenty-eight thousand six hundred ninety-five and 83/100 dollars ($28,695.83), with interest thereon from the date of entry of the final judgment herein, until paid, at the rate of seven per cent (7%) per annum. This sum represents one-half (½) of the value of the good will of the co-partnership of Smith & Bull when converted and appropriated by defendant Frank Bull." The trial court found the date of dissolution of the partnership to be February 27, 1953.

Defendant's contentions, although inartistically phrased, appear to be that there is no evidence to support the trial court's findings that he had converted and appropriated the partnership's customers and that there was a valuable good-

will attached to the business. It is also argued that the question of the existence of goodwill is one of law, rather than fact, and that there is no goodwill attached to a personal service business. Defendant argues that he had the right to accept new business from Seaboard after the dissolution of the partnership without obligation to his "former" partner and without being "penalized in damages" therefor. This latter argument apparently stems from defendant's theory that a dissolution of the partnership took place when he notified Smith that he intended to "liquidate" the firm.

Section 15029 of the Corporations Code provides that "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." It is obvious from the evidence heretofore set forth that the record amply supports the trial court's determination that the partnership continued until February 27, 1953, when the notice of dissolution was signed inasmuch as Bull continued on in the agency's offices until that time. The record does not show that there was any change in the business relationship between the two, or in the operation of the agency's business, prior to that time.

There is also ample support for the trial court's finding that during February, 1953, Bull appropriated and converted for his own benefit and profit the partnership business, goodwill, customers and employees. The employees occupied the same positions with Frank Bull and Company, at the same salaries, as they had with Smith and Bull. It will be recalled that Bull took with him all the partnership accounts and that the major account, Seaboard, was notified early in January of the impending dissolution of the partnership while Smith did not hear about the probable dissolution until Bull's letter to him on February 5th; that Bull and Roach knew early in February that Bull would have the Seaboard account; that Bull could not or would not have opened his own offices without the Seaboard account. On the same day (February 20th) that Bull was officially notified that he was to have the Seaboard account, he signed a lease for new offices and a certificate to do business under the name "Frank Bull & Company" although the partnership was not formally dissolved until February 27th and he did not leave the Smith and Bull offices until February 28th. Smith was not notified of Seaboard's decision to dispense with his services until February 26th.

Defendant's argument that he is being penalized in damages and prohibited from accepting Seaboard employment, *after dissolution*, is devoid of merit. The judgment heretofore set forth did not purport to award plaintiff damages because of the appropriation of the Seaboard account, or any portion of the profit made by Bull from that account, but was concerned, so far as is here pertinent, with the appropriation and value of the goodwill of the business.

There is no merit to defendant's contention that a personal service organization has no goodwill. The record shows that Smith and Bull had, during their long association, enjoyed a fine reputation in the advertising field and that the association had been profitable to all concerned. Although the goodwill of a business may be the result of the personal skill, talent, experience, or reputation of an individual connected with the business, it may attach to and continue with the business even after the separation of the individual on whom it was founded (24 Cal.Jur.2d 142; *Mackay* v. *Clark Rig Bldg. Co.*, 5 Cal.App.2d 44 [42 P.2d 341]). In *Crutchett* v. *Lawton*, 139 Cal.App. 411 [33 P.2d 839], it was held that a contract for the sale of a medical business and the goodwill thereof was valid. In *Driskill* v. *Thompson*, 141 Cal.App.2d 479, 484 [296 P.2d 834] (a business involving the operation of a dance hall), the court held: "Appellant next argues that a partnership dissolvable at will can have no goodwill, because, so it is urged, such can exist only in a going business. . . . The continuance of that business created a goodwill regardless of who continued to operate it. A business, together with its goodwill, may continue regardless of the form of organization used to conduct it. Appellant continued to operate that business and to capitalize on the goodwill of that business as a going concern. This was an asset of the partnership which he was using for his own benefit." In *Miller* v. *Hall*, 65 Cal.App.2d 200, 205 [150 P.2d 287], where the partnership had operated a brokerage business, the court held: "From all of these cases, and many others, it appears to be well recognized that the goodwill of a business may have a considerable value, that while this value may be seriously affected by the competition of a retiring partner the question of such value is one to be determined in the light of all the facts of a particular case, and that where such value exists and is appropriated by one of the former partners for his own use and benefit he may be required to account to the

other partner for his interest in any such value as may appear under the circumstances.

"In the instant case, beyond question, the good will of this business would have had a considerable value had the business been sold to a third party."

Section 14100 of the Business and Professions Code defines "The 'good will' of a business [as] the expectation of continued public patronage." The record here shows that the Smith & Bull agency was in effect a "one account" agency; that the "one account" of value was the Seaboard Finance Company (and its predecessor) and that this account had been serviced satisfactorily by Smith and Bull during the existence of the partnership and for many years prior thereto. It will also be recalled that prior to opening his own agency Bull waited until he was sure that he would have the Seaboard account. ■ As the court stated in *Bergum* v. *Weber*, 136 Cal.App.2d 389, 392 [288 P.2d 623], "The customers of a business are an essential part of its goodwill. In fact, without their continued custom goodwill ceases to exist, for goodwill is the expectation of continued public patronage. (Bus. & Prof. Code, § 14100.)

■ "When the goodwill of a business is sold, it is not the patronage of the general public which is sold, but that patronage which has become an asset of that business."

In the case under consideration, Bull continued to conduct an advertising agency under his own name in the same locality as that in which the partnership of Smith and Bull had operated and with the same personnel servicing the same accounts. The trial court after hearing the evidence summarized Bull's conduct as follows: "Why certainly he took everything that amounted to anything in the way of business. All that was left was the physical assets, which didn't amount to much, but he took this big Seaboard account, which was the business —it was the biggest portion of the business—and he took that and he didn't ask him. He just simply took it, that's all."

Defendant's reliance upon the case of *Heywood* v. *Sooy*, 45 Cal.App.2d 423, 426, 427 [114 P.2d 361], is misplaced. It was there said, in commenting upon the case of *Little* v. *Caldwell*, 101 Cal. 553 [36 P. 107, 40 Am.St.Rep. 89], that "the cited case repudiates the notion that a partner is accountable *after dissolution* for any allowance for what may be termed the 'good will' of the partnership which may result in contracts of employment *after* dissolution. While the cited case did not involve the precise points presented here, we believe

that it clearly indicates the line of demarcation between 'unfinished business,' being business covered by contracts of employment at the time of dissolution, and other matters, not covered by contracts of employment, but which *thereafter* become the subjects of contracts of employment through the goodwill previously existing between the partnership and the clients. As to the 'unfinished business,' a duty to perform services rests on the partnership at the time of dissolution and continues thereafter to rest on the partners or the surviving partner. As to other matters, no duty to perform services rests on the partnership at the time of dissolution and no duty continues thereafter to rest on the partners or surviving partner. And where no duty to perform the services rests on the partnership at the time of dissolution, such services as may thereafter be performed by either of the former partners under contracts of employment *subsequently* made with former clients cannot be considered 'unfinished business' of the partnership at the time of dissolution.'' (Emphasis added.) ▮ The goodwill with which we are here concerned does not involve the profits made from Seaboard employment subsequent to dissolution and does not concern profits made from that employment subsequent to dissolution or so far as goodwill is concerned any unfinished business of Smith and Bull. We are concerned with the goodwill of what had been a going concern whose major client was Seaboard and the fact that had the Smith and Bull agency been sold to a third person that goodwill, because of the Seaboard account, would have been considered a valuable asset of the partnership. In *Little* v. *Caldwell*, 101 Cal. 553 [36 P. 107, 40 Am.St.Rep. 89], the court was concerned with an action brought by the widow of a deceased partner of a law firm. It was there held that the surviving partner must account to the estate of his deceased partner for proceeds obtained from contracts made by the firm prior to the death of the partner. In other words, the court was there concerned with ''unfinished business'' of the partnership entered into prior to the dissolution of the partnership. In the case at bar it is obvious from a reading of the record that Bull received the Seaboard account for himself because of the satisfactory service theretofore rendered Seaboard by Smith, Roach and himself. Bull's receipt of the Seaboard account was not a contract ''subsequently'' made with a former client after dissolution of the partnership. He received the account for his own benefit and profit during the continuance of the partner-

ship and the inference is clear that both Bull and Roach worked toward that result without Smith's knowledge or consent. The inference is also very clear that any dissatisfaction Seaboard may have had with the way in which its account was handled was concealed from Smith who was informed by Roach, probably around February 20th, in an undated letter, that he had "just about resolved all weakness and got the complaints quieted" and that "everything is alright," that the "whole year's campaign for all medias [was] layed out and approved" and that "All's well so don't worry about it any more." In the same letter Smith was warned against "Any further discussion or re-opening of the issues" since to do so would "only serve to confuse and irritate all concerned" at Seaboard.

As the trial court remarked: "It is just because people who have become acquainted with the firm keep on going there and doing business there. Of course, here there is the added factor that Mr. Bull remained, and more important than that, that Mr. Roach remained. He was the guiding figure in this whole thing. In spite of his peculiar actions, some of which I don't believe, he was still the one that kept this account [Seaboard] for Mr. Bull and steered it over to him. I have no doubt about that." The court also commented that the name of Smith and Bull was not abandoned completely. "It became Bull. But here was the same man; there was never any change whatsoever in faces. Here was the same face, but the one they were dealing with was this Mr. Roach. This was a one account agency practically, for all practical purposes. They had all their eggs in one basket, and this Mr. Roach was the one who was getting into their good graces and cementing the account there and holding onto it, and he did hold onto it, and he carried it right along with Mr. Bull. There was never any change at all. They hadn't seen Smith for a long time. They weren't relying on Smith. They were relying on this firm, and Bull just simply took the whole thing over. He took it lock, stock and barrel. Believe me, that is one thing the evidence does show. He just took everything." Defendant's argument that at one of the early February meetings Smith announced that he was going to try to get the Seaboard account is directed to the weight of the evidence with which we are not here concerned. The weight of the evidence, and the credibility of the witnesses, are matters for the trier of fact. And the quoted excerpts from the remarks

of the trial judge clearly show his opinions concerning both the weight of the evidence and the credibility of the witnesses.

There is no merit to defendant's contention that the trial court erroneously fixed the value of the goodwill. Plaintiff's expert witness, a certified public accountant, testified fully as to the methods used by him in computing the value of the goodwill. He also testified that it was not customary to carry a goodwill item on the books of a firm unless it had been purchased by that firm. His testimony was not controverted in any way and is sufficient to support the determination of the trial court that the goodwill of the partnership had a value of $57,391.66 at the time of dissolution and that plaintiff was entitled to one-half thereof.

Defendant's other arguments consist of a reiteration of testimony and evidence which might be considered favorable to him. With such evidence we are not here concerned.

Whether or not defendant was guilty of appropriation and conversion of firm assets, including the goodwill thereof, was a question of fact; whether the business possessed a goodwill is also a question of fact to be determined upon the trial of the action (*Mackay* v. *Clark Rig Bldg. Co.*, 5 Cal.App. 2d 44, 60 [42 P.2d 341]). The trial court determined the issues here involved adversely to defendant. **[11]** When there is substantial evidence or any inference to be drawn from the evidence to support the findings of the trial court, an appellate court will not make determinations of factual issues contrary to those made by the trier of fact. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]; *Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384]; *Ambriz* v. *Petrolane Ltd.*, 49 Cal.2d 470, 477 [319 P.2d 1].)

For the foregoing reasons, the judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

McCOMB, J., Concurring and Dissenting.—I would modify the judgment of the superior court by striking therefrom the following:

"3. That plaintiff shall recover from defendant Frank Bull the sum of twenty-eight thousand six hundred ninety-five and 83/100 dollars ($28,695.83), with interest thereon from the date of entry of this final judgment, until paid, at the rate of seven per cent (7%) per annum."

As so modified, I would affirm the judgment for the reasons

expressed by Mr. Presiding Justice White in the opinion prepared by him for the District Court of Appeal (Cal.App.), 318 P.2d 46.

Appellant's petition for a rehearing was denied June 11, 1958.