[Civ. No. 62372. Second Dist., Div. Five. Aug. 18, 1983.]

ROSENFELD, MEYER & SUSMAN, Plaintiff and Appellant, v. PETER R. COHEN et al., Defendants and Appellants.

COUNSEL

Harney & Moore, Rosenfeld, Meyer & Susman, Gary A. Schlessinger, Sondra Berchin, Clifford W. Gilbert, Horvitz & Greines, Irving H. Greines and Alan G. Martin for Plaintiff and Appellant.

Peter R. Cohen, in pro. per., William I. Chertok and Belcher, Henzie, Biegenzahn, Chertok & Walker for Defendants and Appellants.

## OPINION

**NEBRON, J.**\*—This is an appeal from a judgment on the pleadings, a partial summary judgment and a nonsuit rendered by two departments—one a law and motion department and the other a trial department. In this appeal we are concerned only with the rulings of the law and motion department and the trial department relative to appellant's third, fourth and fifth causes of action.

The issue which underpins all three causes of action here involved may be generally stated as follows: Given the facts of this case, does a former partner of a partnership at will owe any fiduciary duty to former partners after dissolving the partnership and subsequently agreeing with former clients of the dissolved partnership to accept and carry on business which was originally a portion of the assets of the dissolved partnership?

The answer is clearly in the affirmative and for reasons hereafter set forth, the rulings of the lower courts as to counts III, IV and V are reversed and the case is remanded back to the trial department for further proceedings.

### STATEMENT OF FACTS

Appellant Rosenfeld, Meyer & Susman (hereinafter called RM&S) consists of the 17 former partners of a dissolved at-will law partnership suing in the name of the dissolved RM&S partnership as both winding up partners and in their individual capacities. Respondents Peter R. Cohen and Deborah D. Riordan, as administratrix of the estate of Edward J. Riordan, deceased, (hereinafter called C&R) are the two former partners who dissolved that at-will partnership. International Rectifier Corporation (hereinafter called Rectifier) is a former client of the dissolved RM&S partnership.

In late 1968, Rectifier, which was engaged in the manufacture and sale of rectifiers and pharmaceuticals, primarily broad spectrum antibiotics, sought attorneys to bring a major patent antitrust action on a contingent fee basis against the five main domestic manufacturers and distributors of broad scope antibiotics. (Pfizer, Cyanamid, Bristol-Meyers, Squibb and Upjohn.) After considering the proposals of several law firms, Rectifier entered into

---

*Assigned by the Chairperson of the Judicial Council.

a written agreement with RM&S in March 1969, employing RM&S to represent Rectifier in that litigation. The RM&S-Rectifier agreement provided that RM&S would be paid limited fees of $30 per hour up to a maximum of 1,000 hours per year for five years against one-third of any recovery and that Rectifier would bear all costs and expenses.[1]

Most of the attorney services rendered by RM&S were performed by C&R, the two senior litigators at RM&S, both experienced in antitrust litigation. From March 1969 through April 30, 1974, RM&S attorneys spent in excess of 19,000 hours on the case. Moreover, RM&S also supervised almost 60,000 hours of paralegal and document clerk services. Other than C&R, no partner had anything but a passing acquaintance with the Rectifier case. The Rectifier account substantially increased RM&S's expenses. RM&S was required to rent additional office space, hire additional support personnel for the Rectifier action and employ additional attorneys to handle matters which otherwise would have been attended to by C&R.

Cohen joined RM&S as an associate in 1959 and became a partner in 1963; Riordan was employed by RM&S as an associate in 1969 and became a partner in 1970.

From the time Cohen became a partner, each partner's profit percentage was fixed by a committee and approved by the partnership. Profits were determined only after fees were received by RM&S and then divided among the partners pursuant to their current partnership percentage, regardless of a partner's work on any particular matter. Throughout the five years that C&R handled the Rectifier action, they received approximately $800,000 from RM&S, despite the fact that they produced virtually no income for the firm during this period. The other partners of RM&S expected to share in the fee from the Rectifier action should it eventually materialize.

By late 1973, C&R believed the trial of the Rectifier action would commence in the fall of 1974 and that the case would settle for between $20 million and $50 million, or, if tried, that the judgment would be approximately $100 million before trebling. Sometime in December 1973, or January 1974, C&R demanded that they be allocated double their partnership percentage of the fee to be paid by Rectifier in connection with the Rectifier

---

[1] At the time the RM&S-Rectifier agreement was made, Rectifier house counsel were Alan Stamm (Stamm) and Gerald A. Koris (Koris). Stamm was a law school classmate of Cohen and had followed Cohen's nine-year prosecution of *Lear Incorporated* v. *Adkins,* which had been argued in the United States Supreme Court. Koris had on a prior occasion retained Cohen to represent Rectifier. Cohen talked to Koris almost on a daily basis about the lawsuit for five years prior to the dissolution of the partnership.

The contingent fee agreement, dated March 12, 1969, was negotiated by C&R (for RM&S) and Stamm, Koris and Lidow (Rectifier's president) for Rectifier.

action. C&R threatened that if RM&S did not agree to change the partnership allocation, they would withdraw from RM&S. Thereafter, RM&S partners negotiated with C&R to avoid their withdrawal or to make arrangements for C&R to complete the Rectifier action should they withdraw from the firm. As these negotiations progressed, C&R made new demands and stated to two of the partners of RM&S that they would never settle the dispute which they had created. As late as March 26th, or 27th, Riordan told a third partner that C&R no longer needed RM&S. Riordan stated his belief that if C&R withdrew from the firm Rectifier would hire C&R to complete the case,[2] and would provide the necessary financing.

On March 28, 1974, RM&S partners and C&R met with Rectifier's president (Lidow) and vice president/general counsel (Koris). RM&S described the problem at the firm and explained that the firm was willing to make concessions to C&R, but that C&R would not agree. RM&S also assured Rectifier that if C&R withdrew, RM&S would do whatever was necessary to pursue the case, such as assigning other partners to work on the case and/or retaining, at RM&S's expense, skilled antitrust attorneys as counsel. Rectifier's officers stated that they wanted C&R to remain on the case and that C&R should do whatever was necessary to achieve that result.

On April 11, 1974, C&R by memorandum to the other partners gave notice of their withdrawal from the firm effective April 30, 1974. During the first week of May 1974, C&R formed the law firm of Cohen and Riordan. At that time Cohen had no prospective clients, but he believed that Rectifier would ultimately discharge RM&S and hire C&R to complete the antitrust action.

On May 14, 1974, Rectifier mailed a letter of discharge to RM&S and on the following day hand delivered a similar letter of discharge to RM&S. On May 16, 1974, Rectifier retained C&R as attorneys in the Rectifier action.

The C&R-Rectifier agreement provided that Rectifier would pay to C&R $250,000 per year and 8¾ percent of the recovery in the Rectifier action. The agreement further provided that C&R would indemnify Rectifier against its total attorney's fees (including fees payable to C&R and RM&S) exceeding ⅓ of Rectifier's recovery in the antitrust action, and that the 8¾

---

[2]This reasoning was based upon *Fracasse* v. *Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9]. *Fracasse* permits a client who retains an attorney pursuant to a contingent fee agreement to discharge the attorney with or without cause and to pay the reasonable value of the discharged attorney's services if and when said contingency occurs, rather than the fee specified in the agreement.

percent contingent fee would be held in escrow for C&R until the amount of the total fees was resolved.

The C&R-Rectifier agreement permitted C&R to receive approximately two times their RM&S partnership percentage of the Rectifier fee. The 8¾ percent contingent fee provided for equals approximately 26 percent of the fee that Rectifier was obligated to pay RM&S under the RM&S-Rectifier agreement. It is also approximately 2.2 times C&R's claimed 1973 partnership percentage of 12 percent in RM&S's 33⅓ percent contingent fee. Thus, both C&R and Rectifier were to financially benefit by the new C&R-Rectifier agreement.

Trial of the Rectifier action commenced in November 1974, and in August 1975 the action was settled for $33 million and royalty free licenses authorizing Rectifier to manufacture and sell certain broad scope antibiotic drugs. Pursuant to the C&R-Rectifier agreement, Rectifier paid C&R $337,000 in current compensation for the period May 1974 through August 1975, and placed $2.4 million in escrow as C&R's 8¾ percent contingent fee. In October 1975, RM&S commenced the present action.

*The rulings of the law and motion department and the trial department concerning the three causes of action involved in this appeal.*

(1) As to the *third* cause of action (breach of fiduciary duty): The third cause of action alleges that C&R breached their fiduciary duty as partners of RM&S by dissolving RM&S in bad faith to cause Rectifier to discharge RM&S and obtain increased compensation for themselves (bad faith dissolution); further, that the Rectifier action was the unfinished business of the dissolved RM&S partnership and that C&R breached their fiduciary duties by failing to complete the case for the dissolved partnership and that they held the sums received from Rectifier for completing the case as constructive trustees for the dissolved RM&S (unfinished business).

The law and motion department denied C&R's motion for summary judgment on the third cause of action, but found that the following issues regarding the third cause of action for breach of fiduciary duty were without substantial controversy: (a) That RM&S was a partnership at will; (b) that RM&S had failed to state a cause of action because a partner in a partnership at will may exercise his right to dissolve the partnership for any reason and in bad faith; and (c) that Rectifier terminated their agreement with RM&S in mid-May 1974, and that the termination of such agreement precluded

RM&S from stating a cause of action against C&R for breach of C&R's fiduciary duty to complete unfinished business.

The rulings of the law and motion department were each subject to the express limitation that RM&S was permitted to prove other alleged breaches of fiduciary duty occurring prior to mid-May 1974. Appellants assert that the trial department eliminated this portion of the law and motion department's ruling and that therefore the issues were not adjudicated. Appellants claim that such rulings by the trial department were prejudicial because they were precluded from proving that C&R violated their fiduciary duties to RM&S prior to mid-May by: (a) Formulating a secret plan to let RM&S finance the Rectifier action until C&R believed the case was close to trial and then making a joint demand for an unprecedented division of the contingent fee; (b) making disparaging remarks to Rectifier about RM&S which C&R did not disclose to RM&S; and (c) failing to complete unfinished business before the termination of the RM&S-Rectifier agreement.

(2) As to the *fourth* cause of action (interference with contractual relations): The fourth cause of action alleged that C&R interfered with the RM&S-Rectifier agreement. The trial department agreed with C&R that RM&S's allegations of ultimate fact—that C&R advised, counseled and persuaded Rectifier to discharge RM&S—failed sufficiently to allege wrongful acts and that RM&S was therefore limited to proof of the specific evidentiary facts alleged in the complaint—i.e., that Cohen and/or Riordan told Rectifier either that only C&R could successfully complete the Rectifier action or that RM&S was incapable of doing so.

RM&S contends that the trial department unduly limited RM&S's proof of C&R's interfering conduct and further excluded relevant circumstantial evidence from which the jury could have inferred interference. At the close of RM&S's case, the trial department granted C&R's motion for nonsuit.

(3) As to the *fifth* cause of action: (Conspiracy to interfere with contractual relations.) The fifth cause of action alleges that Rectifier interfered with the contractual relations of RM&S by convincing C&R to withdraw from RM&S and enter into a contract with Rectifier to complete the Rectifier action for a lower fee than provided for under the RM&S-Rectifier agreement, and that C&R conspired with Rectifier in such interference. The law and motion department granted C&R's motion for judgment on the pleadings.

### ISSUES ON APPEAL

■ *Did the law and motion department err when it ruled that a partner member of a partnership at will has at any time an absolute right to dissolve the partnership even in bad faith?* Yes.

The law and motion department found that RM&S was a partnership at will. Based on this finding, the department drew the legal conclusion that RM&S's allegation that C&R breached their fiduciary duties by dissolving RM&S in bad faith failed to state a cause of action. The court ruled that *Page* v. *Page* (1961) 55 Cal.2d 192 [10 Cal.Rptr. 643, 359 P.2d 1] stands for the proposition that a partner in an at-will partnership has an absolute right to dissolve the partnership even in bad faith—i.e., that a partner's thoughts, motives or intentions in the act of dissolving a partnership at will are not relevant since the right to dissolve is absolute.

In *Page* v. *Page, supra,* 55 Cal.2d 192, the plaintiff, one of two partners in a linen supply company, sued for a declaration that the partnership between himself and defendant was a partnership at will. The evidence showed that the partners had entered into an oral agreement without discussing any fixed term; that the partnership had suffered losses for many years; that defendant had contributed over $43,000 to the partnership which had been exhausted by such losses; that plaintiff had given notice of dissolution of the partnership just when the partnership was beginning to become profitable because of the establishment of an air force base in its vicinity; that because plaintiff operated the business and was its major creditor, he was in a unique position to obtain the profitable business opportunities of the partnership upon its dissolution.

In ruling for the defendant, the trial court in *Page* found that the partnership was for a term and that plaintiff could not dissolve the partnership just as it was becoming profitable. But the Supreme Court reversed, holding that the evidence did not support the trial court's finding that the partnership was for a term and further that there was no showing in the record of bad faith or that the improved profit situation was more than temporary.

Our state Supreme Court in a unanimous opinion recently explained the meaning of the *Page* case in considerable detail. Said the court in *Leff* v. *Gunter* (1983) 33 Cal.3d 508, 514-517 [189 Cal.Rptr. 377, 658 P.2d 740]:

"There is an obvious and essential unfairness in one partner's attempted exploitation of a partnership opportunity for his own personal benefit and to the resulting detriment of his copartners. It may be assumed, although perhaps not always easily proven, that such competition with one's own partnership is greatly facilitated by access to relevant information available only to partners. Moreover, it is equally obvious that a formal disassociation of oneself from a partnership does not change this situation unless the interested parties specifically agree otherwise. It is no less a violation of the trust imposed between partners to permit the personal exploitation of that

partnership information and opportunity to the prejudice of one's former associates by the simple expedient of withdrawal from the partnership.

"The foregoing reasoning has been well established, and the underlying ethical principles firmly and consistently supported by precedent. In *Page* v. *Page* (1961) 55 Cal.2d 192, 197 [10 Cal.Rptr. 643, 359 P.2d 41], we observed: 'We have often stated that "Partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind." [Citations.]'

" . . . . . . . . . . . . . . . . . . . . . .

"Even more pertinent to the precise issue before us, we noted further in *Page, supra,* 55 Cal.2d at page 197: 'A partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully compensates his copartner for his share of the prospective business opportunity.' In *Page,* while we allowed one partner (plaintiff) to dissolve a partnership over the objections of another (defendant), we carefully emphasized the protection which was afforded the defendant in the continuing fiduciary obligation of plaintiff 'not to exclude defendant wrongfully from the partnership business opportunity.' (*Id.,* at pp. 197-198.)

" . . . . . . . . . . . . . . . . . . . . . .

"While no statute precisely controls the issue before us, our foregoing conclusions are fully consistent with existing legislation. Corporations Code section 15021, subdivision (1), for example, provides: 'Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction *connected with* the formation, conduct, or liquidation of the partnership or from any use by him of its property.' (Italics added.) In addition, section 15030 of that code provides: 'On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed.' " (See also *In re Security Finance Co.* (1957) 49 Cal.2d 370 [317 P.2d 1]; *Vale* v. *Union Bank* (1979) 88 Cal.App.3d 330 [151 Cal.Rptr. 784].)

In the instant case RM&S sought to prove that C&R used their threat to resign and cause RM&S a large loss as a weapon to attempt to change the partnership relationships at the expense of other RM&S partners.

Moreover, the law and motion department's holding that a partner may dissolve a partnership at will in bad faith is not only contrary to *Page* v. *Page, supra,*[3] 55 Cal.2d 192, and other cases heretofore cited, but is also contrary to the established principle that even nonfiduciaries must exercise their rights in good faith, deal fairly with each other and refrain from injuring the right of another party to receive the benefits of an agreement or relationship. (See also *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883]; *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327-329 [171 Cal.Rptr. 917]; *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 453 [168 Cal.Rptr. 722]; *Vale* v. *Union Bank, supra,* 88 Cal.App.3d 330, 336; *Foley* v. *U. S. Paving Co.* (1968) 262 Cal.App.2d 499, 505-507 [68 Cal.Rptr. 780]; *Matzen* v. *Horwitz* (1951) 102 Cal.App.2d 884, 892 [228 P.2d 841].)

Moreover, the law and motion department's ruling that as a matter of law a partner has the absolute right to dissolve a partnership at will without regard to breach of fiduciary consequences is contrary to the principle that a person may be estopped from exercising rights in bad faith. Both in *Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App.3d 311, 328-329 and in *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d at pages 455-456, the courts held that even in relationships normally terminable at will circumstances such as longevity of satisfactory service may give rise to an estoppel precluding the employer from exercising his right to discharge the employee without good cause or in bad faith, especially when such exercise is timed to deprive one of the parties of his reasonable expectations.

In this case, the law and motion department's order in effect precluded RM&S from presenting evidence which would have permitted the trier of fact to infer that C&R were estopped to time the exercise of their right to dissolve the partnership so as to collect over $800,000 from RM&S for their work on the Rectifier action and then defeat the reasonable expectations of the other RM&S partners by dissolving RM&S in bad faith when C&R believed the Rectifier action would soon come to trial.

The law and motion department relied on *Glassell* v. *Prentiss* (1959) 175 Cal.App.2d 599, 605 [346 P.2d 895] and *Clarke* v. *Fiedler* (1941) 44 Cal.App.2d 838, 849 [113 P.2d 275] to support its ruling that a partner is not liable for dissolving an at-will partnership in bad faith. But these cases are distinguishable. In *Glassell* some partners dissolved an at-will partnership. In holding that the dissolving partners were not liable for dissolving

---

[3]"Even though the Uniform Partnership Act provides that a partnership at will may be dissolved by the express will of any partner (Corp. Code, § 15031, subd. (1)(b)), this power, like any other power held by a fiduciary, must be exercised in good faith." (*Page* v. *Page, supra,* 55 Cal.2d 192, 196.)

the at-will partnership the court expressly found that such partners acted in good faith and made no profit from the transaction. And in *Clarke,* the court held that since the partnership agreement was silent on partnership duration and no evidence was introduced on that issue, the partnership was a partnership at will. But a case that holds that a particular partnership is at will does not address the issue whether such a partnership may be dissolved in bad faith.

■ *Was the Rectifier action the unfinished business of the dissolved RM&S partnership so that C&R breached their fiduciary duties by failing to complete the case for the dissolved partnership and thus held the sums received from Rectifier for completing the case as constructive trustee for the dissolved RM&S?* Yes.

■ The concept of unfinished business arises from the rule of law that upon the dissolution of a partnership, the partnership is not terminated but continues to exist for the limited purpose of winding up its affairs and completing all unfinished business.[4] Thus, on May 1, 1974, the day following the dissolution of RM&S, there existed three entities: C&R (comprised of Cohen and Riordan), a new RM&S (comprised of the partners of RM&S remaining on Apr. 30, 1974), and the dissolved RM&S which had not yet been wound up. Until the dissolved partnership was wound up, the partners of the dissolved RM&S continued to owe fiduciary duties to each other, especially with respect to unfinished business. (See *Laux* v. *Freed* (1960) 53 Cal.2d 512, 522 [2 Cal.Rptr. 265, 348 P.2d 873]; *Estate of Witlin* (1978) 83 Cal.App.3d 167, 175 [147 Cal.Rptr. 723]; *Mashon* v. *Haddock* (1961) 190 Cal.App.2d 151, 166 [11 Cal.Rptr. 865].)

Two fiduciary duties are particularly relevant to this appeal:

■ First, each partner of a dissolved partnership has the duty to wind up and complete the business of the dissolved partnership existing prior to its dissolution (unfinished business). (Corp. Code, §§ 15030, 15033; *Smith* v. *Bull* (1958) 50 Cal.2d 294, 303-304 [325 P.2d 463] ("As to the 'unfinished business,' a duty to perform services rests on the partnership at the time of dissolution and continues thereafter to rest on the partners or the

---

[4]The Uniform Partnership Act provides: "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." (Corp. Code, § 15029.)

"On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." (Corp. Code, § 15030.)

"Except so far as may be necessary to wind up partnership affairs or to complete transactions begun but not then finished, dissolution terminates all authority of any partner to act for the partnership, [¶] (1) With respect to the partners, [¶] (a) When the dissolution is not by the act, bankruptcy or death of a partner . . . ." (Corp. Code, § 15033.)

surviving partner." *Id.*, at p. 304); *McNutt* v. *Hannon* (1920) 183 Cal. 537, 538-542 [191 P. 1108]; *Little* v. *Caldwell* (1894) 101 Cal. 553, 558-562 [26 P. 107] ("[T]he surviving partner must complete all executory contracts of a firm which remain in force after the death of a partner . . . ." *Id.*, at p. 560); *Osment* v. *McElarth* (1886) 68 Cal. 466, 469-470 [9 P. 731].)

Second, a partner of a dissolved partnership may not take any action with respect to unfinished business which leads to purely personal gain. (See *Smith* v. *Bull, supra,* 50 Cal.2d 294; *McNutt* v. *Hannon, supra,* 183 Cal. 537; *Little* v. *Caldwell, supra,* 101 Cal. 553; *Osment* v. *McElarth, supra,* 68 Cal. 466.)

A partner of a dissolved partnership who violates anyone of these fiduciary duties is liable to the other partners for this breach.

█ Notwithstanding the foregoing, the law and motion department dismissed RM&S's claim that C&R were liable for such breach, reasoning that Rectifier's discharge of RM&S precluded any liability. The law and motion department focused on the date of RM&S's discharge rather than the date of RM&S's dissolution to determine the duties of C&R with respect to unfinished business. █ To determine whether business of a dissolved partnership is unfinished business, the court should look to the circumstances existing on the date of dissolution of the partnership, not to events occurring thereafter. Thus, in *Smith* v. *Bull, supra,* 50 Cal.2d at pages 303-304, the court states that *Little* v. *Caldwell, supra,* 101 Cal. 553, "'. . . clearly indicates the line of demarcation between "unfinished business," being business covered by contracts of employment at the time of dissolution, and other matters, not covered by contracts of employment, but which *thereafter* become the subjects of contracts of employment through the goodwill previously existing between the partnership and the clients. As to the "unfinished business," a duty to perform services rests on the partnership at the time of dissolution and continues thereafter to rest on the partners or the surviving partner. . . .'" And in *Heywood* v. *Sooy* (1941) 45 Cal.App.2d 423, 426 [114 P.2d 361]: "[T]he test of what constitutes 'unfinished business' of a partnership upon dissolution . . . is whether there existed, at the time of the dissolution, any contract of employment between the partnership and the clients for the performance by the partnership of the services thereafter claimed to be 'unfinished business.'"

█ It is clear, therefore, that the RM&S-Rectifier agreement was unfinished business of RM&S on May 1, 1974, the day following the dissolution of RM&S.

Given the facts of this case, the law and motion department's conclusion that Rectifier's discharge of RM&S in mid-May 1974 precluded a cause of

action for C&R's breach of duty to complete the Rectifier action for the dissolved partnership was error. A trier of fact could find that C&R dissolved RM&S for the very purpose of voiding its fiduciary duty to RM&S; that Rectifier's mid-May discharge letter was therefore the result of C&R's breach of duty to complete unfinished business rather than a termination of C&R's duty; that it was because of C&R's breach of duty during the period May 1 to mid-May that the dissolved RM&S was discharged by Rectifier and lost the difference between what it would have received under the RM&S-Rectifier agreement and the quantum meruit recovery less attorneys' fees that RM&S would have received from Rectifier.

■ The law and motion department's conclusion that Rectifier's discharge of RM&S required dismissal of RM&S's cause of action for breach of C&R's fiduciary duty was also erroneous because a partner of a dissolved partnership who attempts to reap personal gain from the unfinished business of the dissolved partnership is liable to his copartners for breach of fiduciary duty, despite any discharge of the dissolved firm. The existence of the fiduciary duty prohibiting partners of a dissolved partnership from entering into contracts for personal gain in connection with unfinished business of the partnership is well established.

In *Little* v. *Caldwell, supra,* 101 Cal. 553, after the dissolution of a law partnership by the death of one of the partners, the surviving partner entered into a contract with a client of the dissolved partnership to appeal a contingent fee case unsuccessfully tried before dissolution. The new contract altered the existing obligations and rights of the parties by relieving the client from the obligation to pay additional cost and increasing the contingent fee from 15 percent to 60 percent. The surviving partner argued that the client's entry into this agreement with him after the dissolution of the partnership extinguished his obligation to share the fee with the deceased partner. But the court in rejecting this argument stated: "In the discharge of this obligation or duty in relation to the unsettled and unfinished business of the firm, the surviving partner occupies the position of a trustee, and, while he may compromise disputed claims, or modify an existing contract by releasing the other party thereto from some of its obligations, when in the exercise of an honest judgment the best interest of the partnership seems to him to require such action, still, in doing so, he cannot be permitted to make gain for himself at the expense of the estate of the deceased partner, by consenting to the extinguishment of a contract belonging to the partnership, and the substitution therefor of another relating to the same subject matter, and in the profits of which he alone is to participate. Whatever may be the effect of such new or substituted contract as between the immediate parties to it, a court of equity in settling the accounts of the partnership will not treat it as an entire extinguishment of the original contract, or deny the right of the

representatives of the deceased partner to an equitable participation in the profits realized from the latter contract, and which may be regarded, so far as concerns the partnership, as only a modification of the former contract.'' (*Little*, at pp. 560-561 of 101 Cal.)

After *Little* v. *Caldwell* was retried, the trial court held that the second contract entered into by Caldwell with the client was but a modification of the first. This finding was supported by evidence that the second contract did not provide for a fee of 60 percent but for an additional 45 percent fee and because defendant had asked for a release from plaintiff of plaintiff's rights under the first contract. Since the findings of the trial court were sufficient to dispose of the case, the Supreme Court did not address the consequences which would follow from a so-called termination of the first contract and a substitution of a "new contract." The court did, however, state that the trial court was also justified in holding that the contracts were not separate and distinct because "[t]he consideration moving from the attorneys, that they were to prosecute to a conclusion the litigation in question, always remained; the terms of their compensation and risk in so doing alone were varied. . . ." (*Little* v. *Caldwell* (1896) 112 Cal. 27, 30 [44 P. 340].) ■ So in the present case, the consideration moving from C&R—their prosecution of the Rectifier action—continued under the C&R-Rectifier agreement, only the compensation to be paid by Rectifier being varied and this without the acquiescence of RM&S. It is clear that a partner completing unfinished business cannot cut off the rights of the other partners in the dissolved partnership by the tactic of entering into a "new" contract to complete such business.

Given the facts of this case, though Rectifier had a right to terminate the contract with RM&S and hire C&R, C&R could not avoid what was tantamount to a conflict of interest—i.e., the fiduciary duty it owed to RM&S.

Rectifier's purported discharge of RM&S is irrelevant to the issue of C&R's breach of their fiduciary duty to the remaining partners of RM&S. ■ A partner's fiduciary duty to complete unfinished business on behalf of the dissolved partnership arises on the date of dissolution and governs each partner's future conduct regarding this business. ■ Since the Rectifier action remained exactly the same case before and after RM&S's dissolution, C&R's liability for failing to complete the Rectifier case for the dissolved RM&S and for entering into a contract personally to profit from the unfinished business of the dissolved RM&S survived execution of the C&R-Rectifier agreement and Rectifier's discharge of RM&S.

The *Little* v. *Caldwell* opinions and the other unfinished business cases strike a reasonable balance between a partner's right to pursue his own

business after dissolution of a partnership, and his duty of loyalty to his ex-copartners. ■ The partner may take for his own account new business even when emanating from clients of the dissolved partnership and the partner is entitled to the reasonable value of the services in completing the partnership business, but he may not seize for his own account the business which was in existence during the terms of the partnership. Clearly, the balance between such competing public policies is upset if a partner may dissolve a partnership to cause a termination of a partnership business, or if a partner may withhold his necessary services from the dissolved partnership to preclude the completion of unfinished business, or if the partner may complete such business and retain the proceeds for himself.

Inasmuch as the rulings of the law and motion department require reversal of count III, it is not necessary to comment on other rulings of the trial department. Inasmuch as the trial department will again try the third cause of action, error, if any, heretofore committed, need not recur.

■ *Did the trial department erroneously limit RM&S's presentation of its claim for interference with contract relations?* Yes.

RM&S argue that the trial department's nonsuit order concerning the fourth cause of action (interference with contract relations) should be reversed for the following reasons: (1) The trial department erroneously limited RM&S's proof of its interference claim; (2) the evidence admitted at trial was sufficient for the jury to infer that C&R interfered with the RM&S-Rectifier agreement; (3) the evidence admitted at trial and the excluded evidence was more than sufficient to establish C&R's interference with the RM&S-Rectifier agreement.

We concern ourselves only with RM&S's first contention. Since we agree with RM&S that the trial department committed reversible error, we need not discuss contentions (2) and (3).

■ The elements of a cause of action for intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification for such interference with prospective economic advantage are: (1) The existence of a valid contract or relationship between the plaintiff and another party; (2) the defendant's knowledge of the contract and the intent to induce a breach thereof or to disrupt the contractual relationship; (3) intentional acts on the part of the defendant designed to induce a breach or disrupt the relationship; (4) actual disruption of the contract or relationship as a result of the defendant's conduct; and (5) damages resulting to the plaintiff proximately caused by the acts of the defendant. (*Frazier, Dame, Doherty, Par-*

rish & Hanawalt v. Boccardo, Blum, Lull, Niland, Teerlink & Bell (1977) 70 Cal.App.3d 331, 338 [138 Cal.Rptr. 670]; Buckaloo v. Johnson (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865]; Weiss v. Marcus (1975) 51 Cal.App.3d 590, 600 [124 Cal.Rptr. 297]; Abrams & Fox, Inc. v. Briney (1974) 39 Cal.App.3d 604, 609 [114 Cal.Rptr. 328].) "This tort, although infrequently invoked, is not new to the law. Interference with contractual relations was recognized as an actionable wrong over a century ago in the celebrated English case of Lumley v. Gye (Q. B. 1853) 118 Eng.Rep. 749." (Buckaloo v. Johnson, supra, 14 Cal.3d 815, 822; see also: Prosser, Torts (4th ed. 1971) p. 949.)

The trial court generally agreed with C&R that the allegations and statements in the alleged cause of action, if considered alone, failed to state a cause of action for interference with the contract relations, but it concluded that such allegations, when combined with other allegations in the complaint sufficed to describe the particular acts of interference. The trial department then concluded that the general allegations and statements of interference were only sufficient if combined with this evidentiary allegation. The trial department therefore denied C&R's motion to exclude all evidence and for nonsuit on the opening statement, but then limited RM&S to proving as the only active interference that C&R told Rectifier that they were essential to the case and that RM&S could not adequately represent Rectifier. Appellants argued that they were thus prevented from introducing evidence that would have established C&R's interference with the RM&S-Rectifier agreement in ways other than that specified by the trial court.

In passing upon the sufficiency of a pleading, " 'its allegations must be liberally construed, with a view to substantial justice between the parties.' " (Buxbom v. Smith (1944) 23 Cal.2d 535, 542 [145 P.2d 305]; Gerritt v. Fullerton U. H. School Dist. (1938) 24 Cal.App.2d 482, 486 [75 P.2d 627].) "While orderly procedure demands a reasonable enforcement of the rules of pleading, the basic principle of the code system in this state is that the administration of justice shall not be embarrassed by technicalities, strict rules of construction or useless forms. . . ." (Buxbom v. Smith, supra, 23 Cal.2d 535, 542; Augustine v. Trucco (1954) 124 Cal.App.2d 229, 237 [268 P.2d 780].)

In California, pleading ultimate facts of interference, such as advising, counseling and persuading termination of a contract, is sufficient to state a cause of action for interference with contract. For example, in Buckaloo v. Johnson, supra, 14 Cal.3d 815, the court upheld a complaint for interference with prospective economic advantage which alleged only that defendant approached the contracting party and induced her to make an agreement with the defendant.

▮ In determining whether a complaint states a cause of action, the allegations must be liberally construed in favor of the pleader, the complaint must be read as a whole, not word by word, and each part given the meaning it derives from its context. (E.g., *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42 [172 P.2d 867]. ▮ "There is no rigidity in the pleading requirements . . ." of a cause of action for interference with a contract; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 630, p. 2259 and cases cited.) The core of a cause of action for interference is the act of intentionally interfering with another's contract. In modern times, interference most typically takes the form of persuading a party to end his contract or other economic relationship with the plaintiff, especially in the case of attorney-client relationships. (Rest.2d Torts, § 766, com. c; see generally, Annot. (1969) 26 A.L.R.3d 679.)

Since persuasion is most commonly the "inducement" or "interference" lying at the heart of a cause of action for interference with contract relations, pleading the ultimate fact of persuasion and the means of persuasion should be more than adequate. See *Buckaloo* v. *Johnson, supra,* 14 Cal.3d 815; *Herron* v. *State Farm Mutual Ins. Co.* (1961) 56 Cal.2d 202 [14 Cal.Rptr. 294, 363 P.2d 310] (cause of action for interference stated where complaint alleged insurer told attorney's clients they did not need a lawyer to make satisfactory settlement of claims, inducing termination of contingent fee agreement); *Collins* v. *Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 879-880 [306 P.2d 783] (cause of action for interference stated where it was alleged defendants "with full knowledge of plaintiffs' contract with the corporation, 'wrongfully, intentionally, and without justification' prevented the corporation from depositing in the escrow 'those documents necessary in order to close said escrow'); *Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 79-80 [154 Cal.Rptr. 43] (general allegations stated a cause of action for inducing breach of contract; "induce" defined—"[t]o bring on or about, to affect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on"; a reasonable substitute for "induce" is sufficient); *Weiss* v. *Marcus, supra,* 51 Cal.App.3d 590 (cause of action for interference stated where it was alleged defendants advised person to act in disregard of plaintiff's contract rights); *Kozlowsky* v. *Westminister Nat. Bank* (1970) 6 Cal.App.3d 593, 600 [86 Cal.Rptr. 52] (cause of action for interference stated where a defendant was alleged to have "caused" the termination of plaintiff's employment "intentionally, wantonly, maliciously and without justification" without alleging "any of the circumstances surrounding this action"); *West* v. *Anchor Casualty Co.* (1961) 194 Cal.App.2d 164, 165 [14 Cal.Rptr. 791] (allegations that insurer's agents "did fraudulently and maliciously persuade the Johnsons to repudiate and cancel" a contingent fee agreement with their attorneys and induced them to execute a release with "no justification" for

the acts of interference stated a cause of action); *Freed* v. *Manchester Service, Inc.* (1958) 165 Cal.App.2d 186, 188 [331 P.2d 689] (complaint inartfully alleging essential elements of tort stated a valid cause of action for interference with contract).)

C&R place great reliance on *Augustine* v. *Trucco, supra*, 124 Cal.App.2d 229, but the case is distinguishable. As explained in *Zimmerman* v. *Bank of America* (1961) 191 Cal.App.2d 55, 61 [12 Cal.Rptr. 319], *Augustine* held a complaint for interference defective when it failed to allege that the defendants had " 'intentionally or actively induced or persuaded the Truccos to breach any contract with plaintiff' " or " 'that the Truccos would otherwise have performed any contract with plaintiff, or that it was breached or abandoned by any wrongful act of Allen or Dwyer, or that any act of Allen or Dwyer was the moving cause of the Truccos' breaching the contract.' " *Augustine* "held that the complaint failed to state that the alleged wrongful conduct constituted the 'moving cause' of the breach." Here, unlike *Augustine,* the complaint specifically alleged that C&R's interference was the moving cause of RM&S's loss of the Rectifier case.

█ We are persuaded that the trial department erroneously limited RM&S to proving as the only act of interference that C&R told Rectifier that they were essential to the case and that RM&S could not adequately represent Rectifier. RM&S was thus prevented from introducing evidence that may have established C&R's interference with the RM&S-Rectifier agreement in ways other than that specified by the trial department. The trial department's requirement that the RM&S complaint allege the specification of details and explanation of events urged by C&R conflicts with California's liberal pleading rules, which not only permit allegations of ultimate fact but also require that extraneous material, such as evidentiary facts, be stricken. (E.g., Code Civ. Proc., § 452; *Skopp* v. *Weaver* (1976) 16 Cal.3d 432, 438-439 [128 Cal.Rptr. 19, 546 P.2d 307] (allegation of "agency" alleges ultimate fact and evidentiary allegations explaining how fact originated is unnecessary); *Green* v. *Palmer* (1860) 15 Cal. 411, 414 (evidentiary allegations stricken); *Krug* v. *Meeham* (1952) 109 Cal.App.2d 274, 277 [240 P.2d 732] ("The rule which requires allegations of facts where undue influence is the issue does not require the allegation of evidentiary facts but only that ultimate facts be pleaded; it does not exclude conclusions of fact but only conclusions of law. [Citations omitted.] If substantial facts which constitute a cause of action are averred in the complaint or can be inferred by reasonable intendment from the matters which are pleaded, although the allegations of these facts are intermingled with conclusions of law, the complaint is not subject to demurrer for insufficiency."); see also *Stafford* v. *Shultz* (1954) 42 Cal.2d 767, 782 [270 P.2d 1]).)

■ *Did the court err in granting judgment on the pleadings of RM&S's cause of action for conspiracy to interfere with contract relations based upon the theory that conspiracy to interfere with one's own at-will contract does not state a cause of action?* Yes.

RM&S's fifth cause of action alleges that Rectifier conceived a plan to obtain the legal services contracted for with RM&S at a reduced fee; that Rectifier encouraged C&R to withdraw from RM&S so Rectifier and C&R could terminate their respective relations with RM&S and enter into a new agreement; that C&R joined in the scheme, and that C&R and Rectifier then jointly acted pursuant to the scheme, wrongfully causing dissolution of the partnership and RM&S's loss of the Rectifier fee and other damages.

The law and motion department ruled that California law does not recognize a cause of action for conspiracy to interfere with an "at will" agreement against a party to such a contract. Subsequently, and during trial, *Olivet* v. *Frischling* (1980) 104 Cal.App.3d 831 [164 Cal.Rptr. 87] was decided by the California Court of Appeal. That opinion altered the concept adopted by the law and motion department. A motion to reconsider the law and motion department's ruling and to reinstate the cause of action was made before the trial department and denied upon the basis of *Patterson* v. *Philco Corporation* (1967) 252 Cal.App.2d 63 [60 Cal.Rptr. 110].

■ The real gist of a civil conspiracy action is not the conspiracy itself, but rather the damages suffered thereby. "It is the long established rule that a conspiracy, in and of itself, however atrocious, does not rise to a cause of action unless a civil wrong has been committed resulting in damage. [Citations.]" (*Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64 [35 Cal.Rptr. 652].) ■ To state an action for conspiracy, the complaint must allege (1) its formation and operation, (2) wrongful acts done pursuant thereto and (3) damages arising therefrom. Therefore, the real substance of plaintiffs' complaint is the injuries suffered as a result of defendants' intentional interference with plaintiffs' prospective economic advantage. (*Olivet* v. *Frischling, supra,* 104 Cal.App.3d 831, 837.)

"This is a tort theory of recovery . . . based on interference with a 'relationship' between parties irrespective of the enforceability of the underlying *agreement.* . . . 'The actionable wrong lies in the inducement to break the contract or to sever the relationship. . . .'" (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d 815, 822, italics added.) ■ "This cause of action requires five essential components: (1) an economic relationship containing the probability of future economic benefits accruing to the plaintiffs, (2) defendants' knowledge of the existence of that relationship, (3) defendants' intentional commission of acts designed to disrupt the relationship, (4) ac-

tual disruption thereof and (5) damages proximately caused thereby." (*Olivet* v. *Frischling, supra,* 104 Cal.App.3d 831, 837.)

It is agreed by the parties that a third party may be found liable in tort for *interfering* with an at-will contract. (See e.g., *Skelly* v. *Richman* (1970) 10 Cal.App.3d 844, 862 [89 Cal.Rptr. 556].) It is also agreed that, while a party to a contract may not be held liable in tort for *interfering* with his own contract by breaching it, he may be held liable in tort for interference with his own contract if he conspires with a third party to breach it. (See e.g., *Wise* v. *Southern Pacific Co., supra,* 223 Cal.App.2d 50.)

What is at issue here is whether a party to an at-will contract can be held liable for *conspiracy to interfere with his own contract,* even though he cannot breach it.

In *Patterson* v. *Philco Corporation, supra,* 252 Cal.App.2d 63, plaintiff, an employee, alleged that his coworkers, defendants in the action, had falsified ratings of plaintiff's job performance to cause plaintiff to be fired. Plaintiff further alleged that defendant employer (Philco) ratified this conduct by discharging plaintiff even after plaintiff told Philco officials that the ratings were falsified. The trial court sustained Philco's demurrer and dismissed plaintiff's complaint. The Court of Appeal affirmed, stating that plaintiff's complaint did not allege facts which would limit the right of Philco to discharge plaintiff; that plaintiff's employment was therefore terminable at will under California Labor Code section 2922; that at-will employment contracts do not "come within that class of cases which hold that a conspiracy action will lie against a party to a contract who is included among defendant conspirators." (*Patterson* v. *Philco Corporation, supra,* 252 Cal.App.2d 63, 67.)

As applicable to this case, the *Patterson* ruling is distinguishable. That court expressly recognized that an employer's right to discharge an employee hired at will is not absolute; and that such right is limited by public policy, statutes, *and the implied covenant of good faith and fair dealing.* (*Coats* v. *General Motors Corp.* (1934) 3 Cal.App.2d 340, 348 [39 P.2d 838]; *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, 453.) As indicated elsewhere in this opinion, C&R had the right to dissolve RM&S, but the fiduciary duties owed to RM&S were restricted.

In *Olivet* v. *Frischling, supra,* 104 Cal.App.3d 831,[5] plaintiffs alleged that defendants, partners with plaintiffs in a partnership, conspired to inter-

---

[5]C&R's reliance on the citation in the *Olivet* case to Cooper, *Civil Conspiracy and Interference With Contractual Relations* (1975) 8 Loyola University of Los Angeles Law Review 302 does not support the argument. (*Olivet* v. *Frischling, supra,* 104 Cal.App.3d 831, 838.)

fere with the partnership's prospective economic advantage by forming a competing leasing company and then inducing the principal client of the partnership to refrain from giving new contracts to the partnership and instead to enter into new contracts with defendants' company. No contract or exclusivity agreement existed between the partnership and the client and such relationship was therefore terminable at will. Defendants demurred and the complaint was dismissed. The Court of Appeal construed plaintiffs' complaint as alleging that the defendants had "unlawfully interfered with [the partnership's] on-going business relationship with [the client] by first conspiring to form and then in fact so forming a competing enterprise, and thereafter intentionally disrupting and severely harming [the partnership's] valuable economic advantage." (*Id.*, at p. 837-838.) The court held that these allegations stated a cause of action for conspiracy to interfere with contract relations and the Court of Appeal reversed the trial court stating: ". . . an action for conspiracy to induce a breach of contract will in fact lie against a party to the agreement, regardless of the fact that the party would not be directly liable for its breach as such. (*Wise, supra,* 223 Cal.App.2d at p. 71.) In so holding, the court observed that to hold a contracting party liable in tort not only comports with the general principle that all who are involved in a common scheme are jointly and severally responsible for the ensuing wrong, but also reenforces good morals." (*Olivet, supra,* 104 Cal.App.3d at p. 838.)

The holding in *Patterson, supra,* 252 Cal.App.2d 63, as stated, is distinguishable from this case; moreover, we find it difficult to distinguish between a rule that does not recognize a cause of action for conspiracy by a party to interfere with an "at will" agreement and a rule that does recognize such a cause of action in other situations. Whether the contract is at will or not, it is, after all, the interference which is the essence of the tort. To the extent a wrongful act, apart from the conspiracy itself, may be necessary to impose liability in tort on a party to a contract not at will, it is found in the interfering conduct of the third party coconspirator, for which conduct all conspirators are liable, including the contracting party. (*Mox, Inc.* v. *Woods* (1927) 202 Cal. 675 [262 P. 302]; see also *Owens* v. *Foundation for Ocean Research* (1980) 107 Cal.App.3d 179, 185 [165 Cal.Rptr. 571].)

C&R place reliance on *Francasse* v. *Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9], for the proposition that if Rectifier had an absolute right to terminate the RM&S-Rectifier agreement, C&R could not have been part of a civil conspiracy to interfere inasmuch as Rectifier did what it had a right to do. ▮ As the Supreme Court stated at pages 790-791: "We have concluded that a client should have both the power and the right at any time to discharge his attorney with or without cause. [¶] Such a discharge does not constitute a breach of contract for the reason that it is

a basic term of the contract, implied by law into it by reason of the special relationship between the contracting parties, that the client may terminate that contract at will. It would be anomalous and unjust to hold the client liable in damages for exercising that basic implied right. (See *Martin* v. *Camp* 219 N.Y. 170 [114 N.E. 46], setting forth the rationale for the New York rule.)" The *Fracasse* holding relates exclusively to contractual relationships. Nowhere in *Fracasse* is there any discussion of a client's potential tort liability for wrongful conduct, nor is such analysis necessary for our decision. But an action in tort has been found to lie in other cases where *Fracasse* has been discussed and distinguished. (See *Frazier, Dame, Doherty, Parrish and Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink and Bell, supra,* 70 Cal.App.3d 331, 339; *Trembath* v. *Digardi* (1974) 43 Cal.App.3d 834, 837 [118 Cal.Rptr. 124]; *Abrams & Fox, Inc.* v. *Briney, supra,* 39 Cal.App.3d 604, 608.)

■ Finally, to the extent that the law and motion department based its dismissal of the conspiracy cause of action on its belief that it added nothing to the third and fourth causes of action for breach of fiduciary duty an interference with contractual relations, such dismissal was erroneous since it is well settled authority that a party is permitted to plead alternative legal theories. (*Steiner* v. *Rowley* (1950) 35 Cal.2d 713, 718 [221 P.2d 9]; *Tanforan* v. *Tanforan* (1916) 173 Cal. 270, 273 [159 P. 709]; 3 Witkin, Cal. Procedure (2d ed. 1971), Pleading, § 290, p. 1965.)

■ *Does public policy give C&R an "absolute defense" or "absolute privilege" to breach of their fiduciary duties to RM&S and/or a defense to interference with the RM&S-Rectifier contract because of the fiduciary relationships that exist between attorney (C&R) and client (Rectifier)?* No.

C&R argue that even if RM&S had prevailed, C&R would still be protected because they had an absolute defense or absolute privilege because of the attorney-client relationship with Rectifier.

A similar argument was made in *Leff* v. *Gunter, supra,* 33 Cal.3d 508, 518. Said the court in an analogous situation: "In our view, enforcement of the fiduciary obligations of joint venturers within this context does not, as defendants claim, violate any superior public policy which is designed to encourage competitive bidding on public projects. While such latter policy undoubtedly is important and has been cited to invalidate collusive bidding (see, e.g., *McMullen* v. *Hoffman* (1899) 174 U.S. 639 [43 L.Ed. 1117, 19 S.Ct. 839]) and deceptive combinations between favorite bidders and public authorities (see, e.g., *Morgan* v. *Gove* (1929) 206 Cal. 627 [275 P. 415, 62 A.L.R. 219], the case before us involves no such practices. Defendants point to no authority which suggests that enforcement of the fiduciary ob-

ligations between partners is of less than paramount importance. Even in times of fiscal constraint, the dilution of a partner's ethical responsibilities is too high a price to pay for the maximizing of bids on public projects.''

In *Weiss* v. *Marcus, supra,* 51 Cal.App.3d 590, the interfering attorney-defendants had been substituted for the plaintiff-attorney in a pending contingent fee lawsuit. The alleged interference with plaintiff's contract took the form of advice by defendants to their client that neither he nor they were required to withhold from the proceeds of the settlement any sums due plaintiff. The defendants were not strangers to the matter nor could it be said they bore no fiduciary duty to their client. The court held that the attorneys could be found liable for improperly interfering with their client's contract with the plaintiff-attorney. (See also *Adler, Barish, Daniels, Levin etc.* v. *Epstein* (1978) 482 Pa. 416 [393 A.2d 1175, 1 A.L.R.4th 1144].)

An attorney has no absolute privilege to interfere with contractual relations, whether those of his client or anyone else. To the contrary, the existence of an attorney-client, or some other fiduciary relationship with a party to the contract is, at most, the beginning not the end of the inquiry. ▪ In *Los Angeles Airways, Inc.* v. *Davis* (9th Cir. 1982) 687 F.2d 321, 325, the court summarized California law of privilege in the context of an interference suit against the party who acted as attorney and business advisor to Howard Hughes, who had allegedly breached a contract with the plaintiff. Noting that, in whichever role he acted, the defendant would have only a qualified privilege based on his fiduciary relationship with Hughes, the court explained: "The determination of whether the privilege applies in a particular instance requires a two step analysis. The first step is to determine if the relationship between the parties involves the type of interests that the privilege is designed to protect. The second step is to determine whether, in light of the nature and importance of the above relationship, the advisor's intent in inducing the breach was proper. This second step in the analysis is necessary because . . . the privilege is qualified and not absolute. Where the intent is not proper, the privilege is lost.''

The courts of this and other states have consistently rejected a defendant's attempt to use the existence of some special relationship with a party to the contract as a cloak for his own self-serving interference with the contract. For example in *Abrams & Fox, Inc.* v. *Briney, supra,* 39 Cal.App.3d 604, 609, the court stated: "It is suggested in defendant's brief that he [former husband] had a right to induce the breach of the agreement because of the public interest in reconciliation of the parties to marriage dissolution proceedings. Whether defendant's conduct was privileged or justified depends upon a careful balancing of the importance of the objective advanced by the interference against the importance of the interest interfered with, consid-

ering all the circumstances including the nature of the actor's conduct and the relationship between the parties. These are affirmative defenses and are usually established by proof of facts rather than pleadings." (Fn. omitted) In *Collins* v. *Vickter Manor, Inc., supra,* 47 Cal.2d 875, defendants Engle and Vickter were officers, directors and beneficial owners of the corporation they allegedly induced to breach a contract with plaintiffs. Reversing a judgment dismissing the complaint, the court stated: "Whether or not Engle and Vickter were privileged to cause the corporation to discontinue its relationship with plaintiffs, in the belief that such a course of action was in the best interests of the corporation, is a matter of defense, to be decided by a resolution of the factual issues presumptively involved. Their right, if any, to such privilege, does not affirmatively appear on the face of the complaint." (*Id.,* at p. 883.)

And in *Olivet* v. *Frischling, supra,* 104 Cal.App.3d 831, defendants (the board of directors of Whittier Hospital) terminated a prospective economically advantageous relationship with plaintiff's company so that the defendants could enter into the same business relationship with their own competing entity. In response to a suit for interference, defendants asserted that the complaint showed justification on its face because they were directors of the hospital and ". . . by virtue of this 'confidential relationship,' board members were absolutely privileged to induce the hospital to break off its relationship with Whittier Leasing at any time." (*Id.,* at p. 840.)

The *Olivet* court strongly rejected this contention by saying: "[t]he privilege to induce an otherwise apparently tortious breach of contract is extended by law to further certain social interests deemed of sufficient importance to merit protection from liability. Thus, a manager or agent may, with impersonal or disinterested motive, properly endeavor to protect the interests of his principal by counseling the breach of a contract with a third party which he reasonably believes to be harmful to his employer's best interests. [Citation.] On the other hand, '[i]t is well established . . . that a person is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other.' [Citation.] Obviously, when a manager induces a breach in the hopes that he himself might fill the resultant economic void, he acts not as a servant, i.e., as one upholding his master's best interests, but rather as a naked competitor, devoid of the protections accorded those who labor under standards of fidelity, good faith and fiduciary responsibility." (*Id.,* at pp. 840-841, fn. omitted.)

Similarly, in *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13 [144 Cal.Rptr. 664, 6 A.L.R.4th 184], the defendant asserted an absolute justification for interference based on its financial interest

in the entity with which plaintiff had an economic relationship. Reversing the dismissal of this cause of action, the court held: ". . . the privilege that arises by reason of [Rest. of Torts] section 769 is at most a qualified privilege which depends for its existence upon the circumstances of the case. It is essentially a state-of-mind privilege, and therefore its existence cannot be satisfactorily determined on the basis of the pleadings alone. The resolution of the issue turns on the defendant's predominant purpose in inducing the breach and consequently the matter is to be determined on the basis of proof rather than of pleading." (*Id.*, at p. 22; See also *Herron* v. *State Farm Mutual Ins. Co., supra,* 56 Cal.2d 202, 207; *H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399, 409 [167 Cal.Rptr. 392]; *Richardson* v. *La Rancherita* (1979) 98 Cal.App.3d 73, 80-81 [159 Cal.Rptr. 285]; *Culcal Stylco, Inc.* v. *Vornado, Inc.* (1972) 26 Cal.App.3d 879 [103 Cal.Rptr. 419]; *Greenberg* v. *Hollywood Turf Club* (1970) 7 Cal.App.3d 968, 977-978 [86 Cal.Rptr. 885]; *Kozlowsky* v. *Westminister Nat. Bank, supra,* 6 Cal.App.3d 593.)

■ Given the totality of facts proved and alleged in this case, C&R should not and does not have any unique exemption from liability for interference with contract, even though the contract allegedly interfered with involves a client. In every case, the determination whether the interference is proper (i.e., privileged or justified), or improper involves consideration of numerous factual matters. ■ Section 767 of the Restatement Second of Torts, sets forth the rule as follows: "In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." Essentially, then, "the question on the issue of privilege is whether the actor's conduct was fair and reasonable under the circumstances. . . ." (Rest., Torts, § 767, com. d.) (*Herron* v. *State Farm Mutual Ins. Co., supra,* 56 Cal.2d 202, 206; *Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d 13, 21.) And this is peculiarly a question for determination by the trier of fact. (*H & M Associates* v. *City of El Centro, supra,* 109 Cal.App.3d 399, 409.)

■ *Is C&R's conduct privileged under Civil Code section 47, subdivision 2?[6]* No.

---

[6]*California Civil Code section 47, subdivision 2 reads as follows: "A privileged publication or broadcast is one made—*
"2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding

This statute protects attorneys as well as judges, jurors, witnesses and other court personnel from liability arising from publications made in the course of a judicial proceeding. ■ The policy underlying the privilege is that of affording to our citizens utmost freedom of access to the courts. As a consequence, attorneys are given broad protection from the threat of litigation arising from the use of their best efforts on behalf of their clients. (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 380 [295 P.2d 405]; *Smith* v. *Hatch* (1969) 271 Cal.App.2d 39 [76 Cal.Rptr. 350]; Rest. 2d Torts, § 586, com. a.) The privilege is absolute (*Albertson* v. *Raboff, supra,* at p. 379); it protects publications made with actual malice or with intent to do harm. (*Rader* v. *Thrasher* (1972) 22 Cal.App.3d 883, 887 [99 Cal.Rptr. 670].)

"Although the application of this privilege usually arises in the context of a defamation action it is also applicable in other actions. (*Albertson* v. *Raboff, supra,* 46 Cal.2d 375 [slander of title based on recordation of a spurious lis pendens]; *Thornton* v. *Rhoden,* 245 Cal.App.2d 80, 94 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152] [abuse of process arising out of the giving of notice that a deposition would be taken]; *Pettitt* v. *Levy,* 28 Cal.App.3d 484 [104 Cal.Rptr. 650] [infliction of mental distress based on publication of false documents in connection with proceedings for a variance before a city council and planning commission]; *Kachig* v. *Boothe,* 22 Cal.App.3d 626 [99 Cal.Rptr. 393] [infliction of mental distress based on testimony given in a prior lawsuit]; *Agostini* v. *Strycula,* 231 Cal.App.2d 804 [42 Cal.Rptr. 314] [inducing breach of an employment contract based on perjured testimony given in a civil service proceeding].)" (*Younger* v. *Solomon* (1974) 38 Cal.App.3d 289, 300 [113 Cal.Rptr. 113].)

■ ■ However, "[a]lthough defamatory publications made in the course of a judicial proceeding are absolutely privileged even if made with actual malice (*Albertson* v. *Raboff, supra,* at p. 379; *Gosewisch* v. *Doran* (1911) 161 Cal. 511, 513-515 [119 P. 656]), the absolute privilege attaches only to a publication that has a reasonable relation to the action, is permitted by law *and,* more importantly, *if it is made to achieve the objects of the litigation.* If these requirements are met, the publication is absolutely privileged even though made outside the courtroom and no function of the court or its officers is invoked (*Albertson* v. *Raboff, supra,* at p. 381; *Smith* v. *Hatch, supra,* at p. 45). And although the cases stress that to be privileged

___

authorized by law . . . provided, that an allegation or averment contained in any pleading or affidavit filed in an action for divorce or an action prosecuted under Section 137 of this code made of or concerning a person by or against whom no affirmative relief is prayed in such action shall not be a privileged publication or broadcast as to the person making said allegation or averment within the meaning of this section unless such pleading be verified or affidavit sworn to, and be made without malice, by one having reasonable and probable cause for believing the truth of such allegation or averment and unless such allegation or averment be material and relevant to the issues in such action."

under subdivision 2 of section 47 the defamatory matter need not be relevant, pertinent or material to any issue before the court, *it is an absolute necessity that the publication have some connection or logical relation to the judicial proceeding* (*Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80, 90 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152]; *Jordan* v. *Lemaire* (1963) 222 Cal.App.2d 622, 625 [35 Cal.Rptr. 337]; *Lewis* v. *Linn* (1962) 209 Cal.App.2d 394, 399 [26 Cal.Rptr. 6]; Rest., Torts, §§ 585-589). . . . It follows, therefore, that absolute privilege in judicial proceedings is afforded only if the following conditions have been met: the publication (1) was made in a judicial proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve the objects of the litigation; and (4) involved litigants or other participants authorized by law." (Original italics.) *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 824-825 [106 Cal.Rptr. 718]. Further, the *Bradley* court stated at page 826: ". . . *special emphasis must be laid on the requirement that [the defamatory publication] be made in furtherance of the litigation and to promote the interest of justice.* Only if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term 'judicial proceeding' and the persons who should be regarded as litigants or other participants." (See also *Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270, 284-285 [175 Cal.Rptr. 767].)

"*The obvious purpose of section 47 is to afford litigants freedom of access to the courts* to secure and defend their rights without fear of being harrassed by actions for defamation [citations] *and to promote the unfettered administration of justice* even though as an incidental result it may in some instances provide an immunity to the evil-disposed and malignant slanderer (*Abbott* v. *Tacoma Bank of Commerce* (1899) 175 U.S. 409, 411 [44 L.Ed. 217, 218, 20 S.Ct. 153]; 50 Am.Jur.2d, Libel and Slander, § 231, p. 744). Thus, the application of the absolute privilege *on certain occasions* [citations omitted] must be confined within narrow limits and the tendency of the courts is not to extend such limits unless the public policy upon which the privilege rests is found to exist in a new situation (*Matthis* v. *Kennedy* (1954) 243 Minn. 219 [67 N.W.2d 413]; 50 Am.Jur.2d, Libel and Slander, § 194, p. 697). Accordingly, while it has been held that there is a tendency to extend the absolute privilege to occasions where the communication is provided for and required by law, the class of occasions where the publication of defamatory matter is absolutely privileged is confined to cases in which the public service or the administration of justice requires complete immunity (*Pulliam* v. *Bond* (Mo. 1966) 406 S.W.2d 635, 640)." *Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d 818, 823-824.

■ Completely clear concerning the appropriate application of Civil Code section 47, subdivision 2 is that "California courts have consistently

applied a liberal standard for establishing a relationship between publications made by parties and judicial proceedings. [Citations.]" (*Izzi* v. *Rellas* (1980) 104 Cal.App.3d 254, 262 [163 Cal.Rptr. 689].)

Further, to be afforded protection, the defamatory matter need not be strictly pertinent or relevant to any issue involved in the litigation, but it must have some reference to the subject matter thereof. (*Friedman* v. *Knecht* (1967) 248 Cal.App.2d 455 [56 Cal.Rptr. 540]; *Pettitt* v. *Levy, supra,* 28 Cal.App.3d 484, 489; *Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 865 [100 Cal.Rptr. 656]; *Thornton* v. *Rhoden, supra,* 245 Cal.App.2d 80, 90.)

" " "[D]oubts [if any] are to be resolved in favor of relevancy and pertinency; that is to say, the matter to which the privilege does not extend must be so palpably wanting in relation to the subject matter of the controversy that there can be no reasonable doubt of its impropriety." " " (*Twyford* v. *Twyford* (1976) 63 Cal.App.3d 916, 926 [134 Cal.Rptr. 145], quoting *Thornton* v. *Rhoden, supra,* 245 Cal.App.2d 80, 93; *Friedman* v. *Knecht, supra,* 248 Cal.App.2d 455, 460.)

With the foregoing general rules in mind,[7] we come to the specifics of this litigation. In *Thornton* v. *Rhoden, supra,* 245 Cal.App.2d 80, 90, the court adopted the formulation of the privilege of section 586 of the Restatement of Torts: "An attorney at law is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of a judicial proceeding in which he participates as counsel, if it has some relation thereto."[8]

First, comment (c) of Restatement of Torts section 586 states in part: ". . . the privilege stated in this Section is confined to statements made by an attorney while performing his function as such." It is noted that from the date of dissolution of RM&S (Apr. 30, 1974) until the date C&R was retained as attorney in the Rectifier action (May 16, 1974), C&R was not protected by Civil Code section 47, subdivision 2.

---

[7]For a recent comment, discussion of Civil Code section 47, subdivision 2, see *Absolute Privilege and California Civil Code Section 47(2): A Need for Consistency* (1982) 14 Pacific Law Journal 105.

[8]A change of language appears in Restatement Second of Torts section 586: "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."

Second, in *Thornton* the court formulated the following test: "This approach, which ignores legal niceties and merely looks to some logical connection between the utterance and the proceeding, solves most problems. On the one hand it does not protect attorneys, witnesses and litigants who use the mere fact that they are talking in the course of a judicial proceedings as a pretext to defame persons with respect to matters which have nothing whatever to do with the question under consideration, yet it does shield counsel, his client and witnesses from having their motives questioned and being subjected to litigation if some connection between the utterance and the judicial inquiry can be established." (*Thornton* v. *Rhodes, supra,* 245 Cal.App.2d 80, 90, fn. omitted.)

We can see no connection between the issues raised in this litigation to relevant issues involved in the Rectifier action. Rather, we believe that the fact that C&R were talking to Rectifier in the course of the Rectifier litigation is used as a pretext to shield C&R in this case.

Counsel have cited no cases—and our independent research has uncovered none—where the protections of section 47, subdivision 2 have been applied to a factual situation comparable to this case. Nor can we discern how justice would be served by extending the protections of the section to encompass matters involved in this litigation. Some clue that our state Supreme Court would agree might be found in *Gruenberg* v. *Aetna Ins. Company* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032]. There the court states in an analogous situation at footnote 5: "We reject defendants' argument that a cause of action is not stated because the separate acts of the non-insurer defendants may be privileged in various respects. For example, they contend that Busching's testimony at plaintiff's preliminary hearing, as part of a judicial proceeding, is absolutely privileged [citations omitted], and that the conduct of defendant law firm and its employee Ricketts is given the cloak of immunity under Civil Code section 47. However, even if these privileges apply to the separate acts of the insurers' alleged agents, the defendant insurers may not benefit from them, because their alleged scheme to avoid liability under the policies, in breach of an implied duty of good faith and fair dealing, transcends the individual acts of their agents. Consequently, defendant insurers cannot be heard to say that they are privileged to act in bad faith and deal unfairly with their insured." See also *Westlack Community Hospital* v. *Superior Court* (1976) 17 Cal.3d 465, 482 [131 Cal.Rptr. 90, 551 P.2d 410] where the court reaffirms the rule that Civil Code section 47, subdivision 2 is a statute which confers an absolute privilege which attaches only to *statements* or *publications*, but not *actions* of the person invoking the privilege.

The rulings of the law and motion and trial departments are reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Stephens, Acting, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied September 15, 1983, and the opinion was modified to read as printed above. The petition of defendants and appellants for a hearing by the Supreme Court was denied November 9, 1983. Kaus, J., did not participate therein.